MED-TRANS OF CONNECTICUT, INC., ET AL. *v.*
DEPARTMENT OF PUBLIC HEALTH AND
ADDICTION SERVICES ET AL.
(SC 15626)

Borden, Berdon, Katz, Palmer and McDonald, Js.

Argued April 29—officially released July 29, 1997

*Jeffrey J. Mirman*, with whom was *John E. Shaffer*, for the appellant (named plaintiff).

*Patricia A. Gerner*, assistant attorney general, with whom were *Felicia R. Suggs*, assistant attorney general, and, on the brief, *Richard Blumenthal*, attorney general, and *Richard J. Lynch*, assistant attorney general, for the appellee (named defendant).

*Hugh I. Manke*, with whom, on the brief, were *John F. Wolter* and *Christopher L. Brigham*, for the appellee (defendant Access Ambulance Company, Inc.).

*Opinion*

MCDONALD, J. The sole issue in this appeal is whether the trial court properly determined that the

named plaintiff, Med-Trans of Connecticut, Inc.,[1] lacks standing to appeal from the decision of the department of public health and addiction services, office of emergency medical services (department),[2] granting Access Ambulance Company, Inc. (Access), a license to provide ambulance services in Stamford and Greenwich. The named plaintiff and the plaintiff Danbury-Nelson Ambulance Services, Inc. (Danbury-Nelson), alleging that they each hold a license to provide such services in Fairfield County, appealed from the department's decision to the Superior Court.[3] The defendants, the department and Access, each filed a motion to dismiss the plaintiffs' appeal. The trial court found that the plaintiff and Danbury-Nelson were not aggrieved by the department's decision and rendered judgment dismissing the appeal. The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We affirm the judgment of the trial court.

The relevant, undisputed facts are as follows. Pursuant to General Statutes § 19a-178,[4] the department is

---

[1] The named plaintiff was formerly known as Ace Ambulance Service, Inc.

[2] The department of public health and addiction services was replaced by the department of public health on July 1, 1995. Public Acts 1995, No. 95-257, §§ 12, 21, 58.

[3] Although the named plaintiff was joined in its appeal to the Superior Court by Danbury-Nelson, it prosecutes this appeal alone. We will, therefore, refer to the named plaintiff as the plaintiff throughout this opinion.

[4] General Statutes § 19a-178 provides: "There shall be established within the Department of Public Health an Office of Emergency Medical Services. The office shall be responsible for (a) the licensure or certification of the following: (1) Ambulance operations, ambulance drivers, emergency medical technicians, and communications personnel; (2) emergency room facilities and communications facilities and (3) transportation equipment, including land, sea and air vehicles used for transportation of patients to emergency facilities; (b) periodic inspections of life saving equipment, of emergency facilities and of emergency transportation vehicles to insure that state standards are maintained; and (c) perform such other duties and functions as are assigned to said office by the Commissioner of Public Health." Because

responsible for the licensing and certification of ambulance services. The plaintiff is a licensed emergency medical service operator providing emergency medical services as well as nonemergency ambulance and invalid coach transport throughout Fairfield County. On December 6, 1994, pursuant to General Statutes § 19a-180 (a),[5] Access applied to the department

the only change to the statute since the underlying administrative proceedings was the name change of the department, we use the current version of the statute throughout this opinion. See footnote 2 of this opinion.

[5] General Statutes § 19a-180 (a) provides: "No person shall operate any ambulance service, rescue service or management service without either a license or a certificate issued by the Office of Emergency Medical Services. No person shall operate a commercial ambulance or commercial rescue service or a management service without a license issued by the Office of Emergency Medical Services. A certificate shall be issued to any volunteer or municipal ambulance service which shows proof satisfactory to the commissioner that it meets the minimum standards of the commissioner in the areas of training, equipment and personnel. Applicants for a license shall use the forms prescribed by the Office of Emergency Medical Services and shall submit such application to the Office of Emergency Medical Services accompanied by an annual fee of one hundred dollars. In considering requests for approval of permits for new or expanded emergency medical services in any region, the Office of Emergency Medical Services shall consult with the emergency medical services council of such region and shall hold a public hearing to determine the necessity for such services. Written notice of such hearing shall be given to current providers in the geographic region where such new or expanded services would be implemented, provided that any volunteer ambulance service which elects not to levy charges for services rendered under this chapter shall be exempt from the provisions concerning requests for approval of permits for new or expanded emergency medical services, set forth above. Each applicant for licensure shall furnish proof of financial responsibility which the office deems sufficient to satisfy any claim. The Commissioner of Public Health shall establish by regulation satisfactory kinds of coverage and limits of insurance for each applicant for either licensure or certification, provided until such time as such regulations are promulgated the following shall be the required limits for licensure: (1) For damages by reason of personal injury to, or the death of, one person on account of any accident, at least five hundred thousand dollars, and more than one person on account of any accident, at least one million dollars, (2) for damage to property at least fifty thousand dollars and (3) for malpractice in the care of one passenger at least two hundred fifty thousand dollars, and for more than one passenger at least five hundred thousand dollars. In lieu of the foregoing, a single limit of liability shall be allowed as follows: (A) For damages by reason of personal

requesting a license to operate a new ambulance service in Stamford and Greenwich with a branch office, three ambulances and an invalid coach. The application was referred to the Southwestern Connecticut Emergency Services Council, Inc., which recommended its approval.

The department then held a public hearing on the application, at which the plaintiff and Danbury-Nelson submitted requests to be afforded party status in the proceedings because Access' proposed services "would be in direct competition with those services provided by [them]." The hearing officer denied the requests for party status, but did grant both the plaintiff and Danbury-Nelson intervenor status. After hearings at which the plaintiff and Danbury-Nelson participated, the department granted Access' application.

The plaintiff and Danbury-Nelson appealed from that decision to the Superior Court pursuant to General Statutes §§ 19a-180 (c) and 4-183 (a).[6] The plaintiff and Dan-

injury to, or death of, one or more persons and damage to property, at least one million dollars; and (B) for malpractice in the care of one or more passengers, at least five hundred thousand dollars. A certificate of such proof shall be filed with the Office of Emergency Medical Services. Upon determination by the Office of Emergency Medical Services that an applicant is financially responsible, properly certified and otherwise qualified to operate a commercial ambulance service, the Office of Emergency Medical Services shall issue a license effective for one year to such applicant. If the Office of Emergency Medical Services determines that an applicant for either a certificate or license is not so qualified, it shall notify such applicant of the denial of his application with a statement of the reasons for such denial. Such applicant shall have thirty days to request a hearing on the denial of said application." Because the only change to the statute since the underlying administrative proceedings was the name change of the department, we use the current version of the statute throughout this opinion. See footnote 2 of this opinion.

[6] General Statutes § 4-183 (a) provides: "A person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision may appeal to the Superior Court as provided in this section. The filing of a petition for reconsideration is not a prerequisite to the filing of such an appeal."

bury-Nelson alleged, inter alia, that they improperly had been denied party status by the department because "[a]s direct competitors of [Access], the granting of a license to Access will cause a dilution and a diminuti[on] of the existing licenses held by [them]." The plaintiff and Danbury-Nelson further alleged that the hearing officer and the department improperly concluded that Access had demonstrated the need for its proposed service, that health care facilities in Stamford and Greenwich had experienced response delays in nonemergency service calls from existing providers, and that Access' proposed service would improve response times and be more cost effective. Finally, the plaintiff and Danbury-Nelson alleged that "[a]s direct competitors of Access, [they] will be adversely affect[ed] by the granting of Access' application. In addition, having been issued licenses based upon need and necessity, the value of [their] licenses . . . and the transferability of these licenses, are diminished by the guaranty of Access' application. [The plaintiff] and Danbury[-Nelson] are therefore aggrieved by the [department's] Final Decision granting Access' application."

The trial court found that the interests of the plaintiff and Danbury-Nelson in the department's decision derive solely from the fact that they are existing ambulance companies in the area where Access would be operating. The court found, therefore, that "[t]he injury that [the plaintiff and Danbury-Nelson] would suffer as a result of the decision would be to their business interests—their profits would suffer because of increased competition for nonemergency ambulance business in the area." The court concluded that, because § 19a-180 (a) requires the department, in reviewing an application, to determine only the public necessity for such services, and does not require the department to consider the effects on competition, the interests of the plaintiff and Danbury-Nelson were not at stake in the

department's decision. The court determined, therefore, that the plaintiff and Danbury-Nelson were not aggrieved by the department's final decision granting Access' application and that it lacked subject matter jurisdiction over their appeal. Accordingly, the court granted the defendants' motions to dismiss. This appeal followed.

An appeal from an administrative decision of the department is governed by § 19a-180 (c) and the Uniform Administrative Procedure Act (UAPA). General Statutes §§ 4-166 through 4-189. Section 19a-180 (c) provides: "Any person or emergency medical service organization aggrieved by an act or decision of the Office of Emergency Medical Services regarding certification or licensure may appeal in the manner provided by [the UAPA]."

"Pleading and proof of aggrievement are prerequisites to a trial court's jurisdiction over the subject matter of an administrative appeal. *Bakelaar* v. *West Haven*, 193 Conn. 59, 65, 475 A.2d 283 (1984). It is [therefore] fundamental that, in order to have standing to bring an administrative appeal, a person must be aggrieved. *Connecticut Business & Industry Assn., Inc.* v. *Commission on Hospitals & Health Care*, 214 Conn. 726, 729, 573 A.2d 736 (1990); *Beckish* v. *Manafort*, 175 Conn. 415, 419, 399 A.2d 1274 (1978). . . . *Light Rigging Co.* v. *Dept. of Public Utility Control*, 219 Conn. 168, 172, 592 A.2d 386 (1991).

"The test for aggrievement long recognized by this court is set forth in our decision in *State Medical Society* v. *Board of Examiners in Podiatry*, 203 Conn. 295, 524 A.2d 636 (1987). There we stated that [t]he fundamental test for determining aggrievement encompasses a well-settled twofold determination: first, the party claiming aggrievement must successfully demonstrate a specific personal and legal interest in the subject matter of the decision, as distinguished from a general interest, such

as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that this specific personal and legal interest has been specially and injuriously affected by the decision . . . . *Cannavo Enterprises, Inc.* v. *Burns*, 194 Conn. 43, 47, 478 A.2d 601 (1984); *Bakelaar* v. *West Haven*, [supra, 193 Conn. 65]. Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected. *O'Leary* v. *McGuinness*, 140 Conn. 80, 83, 98 A.2d 660 (1953). *Hall* v. *Planning Commission*, 181 Conn. 442, 445, 435 A.2d 975 (1980). . . . [*State Medical Society* v. *Board of Examiners in Podiatry*, supra], 299–300. The determination of aggrievement presents a question of fact for the trial court and a plaintiff has the burden of proving that fact. *Mystic Marinelife Aquarium, Inc.* v. *Gill*, 175 Conn. 483, 493, 400 A.2d 726 (1978)." (Citations omitted; internal quotation marks omitted.) *United Cable Television Services Corp.* v. *Dept. of Public Utility Control*, 235 Conn. 334, 342–43, 663 A.2d 1011 (1995).

The second prong of the aggrievement test requires the plaintiff to "demonstrate that its asserted interest has been specially and injuriously affected in a way that is cognizable by law. See *State Medical Society* v. *Board of Examiners in Podiatry*, supra, 203 Conn. 300–301." *United Cable Television Services Corp.* v. *Dept. of Public Utility Control*, supra, 235 Conn. 343. "[I]n considering whether a plaintiff's interest has been injuriously affected by [an administrative decision], we have looked to whether 'the injury he complains of (his aggrievement, or the adverse effect upon him) falls within the zone of interests sought to be protected by the statutory provision whose violation forms the legal basis for [its] complaint.' . . . *Air Courier Conference* v. *Postal Workers*, 498 U.S. 517, 523, 111 S. Ct. 913, 112 L. Ed. 2d 1125 (1991), citing *Lujan* v. *National Wildlife Federation*, 497 U.S. 871, 883, 110 S. Ct. 3177, 111 L.

Ed. 2d 695 (1990)." *United Cable Television Services Corp.* v. *Dept. of Public Utility Control,* supra, 344–45.

"Standing concerns the question whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question. [*Assn. of Data Processing Service Organizations, Inc.* v. *Camp,* 397 U.S. 150, 153, 90 S. Ct. 827, 25 L. Ed. 2d 184 (1970)]; *Ducharme* v. *Putnam,* 161 Conn. 135, 139, 285 A.2d 318 (1971); *Maloney* v. *Pac,* 183 Conn. 313, 320–21, 439 A.2d 349 (1981). . . . *State* v. *Nardini,* 187 Conn. 109, 113, 445 A.2d 304 (1982); *Mystic Marinelife Aquarium, Inc.* v. *Gill,* supra, 175 Conn. 483; see *New England Rehabilitation Hospital of Hartford, Inc.* v. *Commission on Hospitals & Health Care,* 226 Conn. 105, 126, 627 A.2d 1257 (1993) (applying zone of interests analysis); *State* v. *Pierson,* 208 Conn. 683, 687, 546 A.2d 268 (1988), cert. denied, 489 U.S. 1016, 109 S. Ct. 1131, 103 L. Ed. 2d 193 (1989) (standing merely requires the party to make allegations of a colorable claim of injury to an interest which is arguably protected or regulated by the statute or constitutional guarantee); see also *New Haven* v. *Public Utilities Commission,* 165 Conn. 687, 702, 345 A.2d 563 (1974) ([i]t is now settled that standing to maintain an action in the federal courts requires proof of injury in fact to an interest within the zone of interests sought to be protected by the federal statute in question)." (Internal quotation marks omitted.) *United Cable Television Services Corp.* v. *Dept. of Public Utility Control,* supra, 235 Conn. 345.

The plaintiff claims that it is aggrieved by the department's decision to grant Access a license to provide ambulance services in violation of § 19a-180 (a) because the competition that results from the decision diminishes the value of the plaintiff's previously exclusive

license to provide ambulance services.[7] Applying the general standards of standing, therefore, our inquiry is whether the plaintiff's interest is within the zone of interests protected by § 19a-180 (a). We applied this principle in *United Cable Television Services Corp.* and *Light Rigging Co.* with differing results. In *Light Rigging Co.* v. *Dept. of Public Utility Control,* supra, 219 Conn. 177, we concluded that various trucking companies were aggrieved by the alleged violation of General Statutes (Rev. to 1985) § 16-286[8] by the department of public utility control in granting a certificate of public convenience and necessity to a competitor. By contrast, in *United Cable Television Services Corp.* v. *Dept. of Public Utility Control,* supra, 235 Conn. 346, we concluded that a cable television company was not aggrieved by the alleged violation of General Statutes (Rev. to 1995) § 16-331 (b), (d) and (h)[9] by the department of public utility control in

---

[7] At oral argument, the plaintiff's counsel stated that the only other service in the area was Danbury-Nelson.

[8] General Statutes (Rev. to 1985) § 16-286 provides: "In determining whether or not such a certificate shall be granted, the department of public utility control shall take into consideration the existing motor transportation facilities and the effect upon them of granting such certificate, the public need for the service the applicant proposes to render, the suitability of the applicant, or the suitability of the management if the applicant is a corporation, the financial responsibility of the applicant, the ability of the applicant efficiently to perform the service for which authority is requested, the condition of and effect upon the highways involved and the safety of the public using such highways. The department shall take into consideration such recommendations as to motor transportation facilities, or highways, or the effect of granting such certificate upon either of them, or the safety of the public using such highways, as the commissioner of transportation may submit to it in writing within thirty days of the conclusion of the hearing thereon. No such certificate shall be denied solely on the ground that there is an existing rail or motor service. When it appears that no motor common carrier service is being supplied over the route or routes applied for, public convenience and necessity shall be presumed to require operation of such service."

[9] General Statutes (Rev. to 1995) § 16-331 provides in relevant part: "(b) In determining whether a new certificate shall be issued or an existing certificate transferred, the department of public utility control shall only take into consideration the suitability of the applicant or, if the applicant

granting a certificate of public convenience and necessity to a competitor, but was aggrieved by that depart-

is a corporation, of its management, the financial responsibility of the applicant and the ability of the applicant to perform efficiently the service for which authority is requested. In the case of an application filed on or after October 1, 1981, (1) if the applicant or an affiliate thereof is the holder of one or more other certificates in the state, the department shall also consider the possible adverse effects of increasing the concentration of ownership of community antenna television systems and related services, which would result from granting the application and (2) suitability of the applicant shall include consideration of participating owners resident in the proposed service area as well as involvement in local civic and community activities. In considering concentration of ownership the department shall only take into account the following factors: (A) Federal and state antitrust and unfair trade practices laws, regulations and policies and (B) the reduced ability of the department to make comparisons with other certificate holders. In the case of an application filed on or after January 1, 1983, for the approval of the transfer of an existing certificate, the department shall also (i) consult with the advisory council established by regulation for the franchise area specified in the certificate and, (ii) if the applicant or an affiliate thereof is the holder of one or more other certificates in the state, consider the adequacy of the service provided by such holder in the franchise areas specified in such certificate or certificates. The department may adopt regulations in accordance with chapter 54 to carry out the purposes of this subsection. . . .

"(d) (1) An initial certificate issued prior to June 1, 1988, shall grant a franchise for fifteen years, provided that for certificates issued prior to January 1, 1975, the initial franchise term shall be deemed to end for four such companies each year, starting in 1989, in order of those companies having the highest gross revenues under chapter 211 or 212a during the calendar year ending December 31, 1982. An initial, renewal or transfer certificate issued on or after June 1, 1988, shall grant a franchise for a term of not less than five years and not more than ten years, except that under special circumstances, as described in subdivision (2), a franchise may be granted for a term of more than ten years but not more than fifteen years. The department shall have the discretion to determine the appropriate length of a franchise term, initial, renewal or transfer, and in making its decision shall consider the following without limitation: (A) The operator's past performance in terms of meeting the needs of the cable-related community; (B) the operator's past performance in terms of complying with the material terms of the existing franchise; (C) the operator's compliance with department regulations and the general statutes; (D) the ability of the operator's management to properly operate the franchise; (E) the operator's effectiveness in dealing with consumer requests, complaints and billing questions or disputes; (F) the operator's effectiveness in dealing with the advisory council; (G) the quality and diversity of the operator's programming; (H) the quality of the operator's community access programming, including

ment's alleged violation of § 16-331 (i).[10]

In this case, the trial court, after reviewing those two cases, concluded that, because § 19a-180 (a) does not require the department to consider the effect on existing

public access, educational access and governmental access programming, in accordance with the provisions of subdivision (3) of this subsection; (I) the quality of the operator's equipment and facilities; (J) the operator's proposals for future extensions and upgrading to technologically advanced equipment, facilities and systems; (K) the operator's past performance in terms of meeting the needs of the cable-related community by providing African-American and Hispanic programming; (L) the operator's good faith efforts, as determined by the department, to provide service, when practicable, to all customers within the service area; (M) the operator's past performance in making available addressable converters, traps or other devices or services which enable subscribers to voluntarily block transmission of specific programming to their homes or places of business; and (N) the applicant's provision of innovative services, including audio services, information services, electronic publishing and information concerning the proceedings of the general assembly and legislative committees.

"(2) Under special circumstances, the department in its discretion, may issue, renew or transfer a franchise for a term of not more than fifteen years if the franchisee has committed itself, as outlined in the franchise agreement, to provide or maintain technologically advanced equipment, facilities and systems, as determined by the department, to enhance and promote technologically advanced educational programming, including the programming specified in subsection (b) of section 10-4e, and to comply with specific quality of service standards, including, but not limited to, the time between installation and repair following a subscriber request, the response time to consumer complaints and the quality of the operator's customer service policies and practices.

\* \* \*

"(h) Each applicant for a certificate shall finance the reasonable costs of a community needs assessment, conducted by an independent consultant and developed jointly by the department, the Office of Consumer Counsel, the local advisory council and the applicant, which assessment shall analyze a community's future cable-related needs and, if applicable, shall provide the department with assistance in analyzing an operator's past performance as defined in subsection (d) of section 16-333*l*. The department shall supervise the assessment and provide the independent consultant with the date upon which the assessment shall be completed and filed with the department. Such community needs assessment shall be conducted in lieu of the requirement in subdivision (12) of subsection (c) of section 16-333-39 of the regulations of Connecticut state agencies. . . ."

[10] General Statutes (Rev. to 1995) § 16-331 (i) provides: "Each certificate of public convenience and necessity for a franchise issued pursuant to this

ambulance service license holders in deciding whether to grant a new license, the plaintiff was not aggrieved. The plaintiff argues that the trial court's decision is "based upon a far too expansive reading of *United Cable [Television Services Corp.]* and an excessively restrictive interpretation of *Light Rigging [Co.]*." The plaintiff contends that the distinction between those two cases is whether the statutory schemes involved required the department to consider the public necessity of the proposed services. We conclude that public necessity alone does not confer aggrievement and, therefore, we find no merit to the plaintiff's arguments.

In *Light Rigging Co.*, we considered "General Statutes (Rev. to 1985) § 16-286 [which required] the [department of public utility control] to consider '*the existing motor transportation facilities and the effect upon them of granting such certificate*, [and] the public need for the service the applicant proposes to render' when determining whether to grant a certificate of public convenience and necessity." (Emphasis added.) *Light Rigging Co.* v. *Dept. of Public Utility Control*, supra, 219 Conn. 176. In *Light Rigging Co.*, the plaintiff trucking companies had standing, not because the department of public utility control was required to consider the public need for the proposed services, but, rather, because their competitive interests were protected by the statute. Id., 177.

In *United Cable Television Services Corp.* v. *Dept. of Public Utility Control*, supra, 235 Conn. 346, we concluded that § 16-331 (b), (d) and (h) "are meant to protect the public at large and not the interests of individual competitors." "[T]he legislature has demon-

---

section shall be nonexclusive, and each such certificate issued for a franchise in any area of the state where an existing franchise is currently operating shall not contain more favorable terms or conditions than those imposed on the existing franchise. This subsection shall not apply to the length of the term of such certification as may be determined pursuant to subsection (d) of this section."

strated an ability to protect existing competitors when it chooses to do so." Id., 351. When it chooses not to, "the community, through the office of consumer counsel, is the appropriate party to raise any claims concerning 'community needs.' " Id., 352. We therefore held that because § 16-331 (b), (d) and (h) did not require the department of public utility control to consider the effects on competition, the cable television company did not allege a legally protected interest under § 16-331 (b), (d) and (h). Id., 346.[11]

Section 19a-180 (a) provides in relevant part: "No person shall operate any ambulance service, rescue service or management service without either a license or a certificate issued by the Office of Emergency Medical Services. . . . A certificate shall be issued to any volunteer or municipal ambulance service which shows proof satisfactory to the commissioner that it meets the minimum standards of the commissioner in the areas of training, equipment and personnel. . . . Upon determination by the Office of Emergency Medical Services that an applicant is financially responsible, properly certified and otherwise qualified to operate a commercial ambulance service, the Office of Emergency Medical Services shall issue a license effective for one year to such applicant. . . ." Section 19a-180, by its language, requires the department to issue a license to a qualified applicant without consideration of the effects on competition. We conclude that § 19a-180 requires the department primarily "to protect the public at large and not the interests of individual competitors"; *United Cable Television Services Corp.* v. *Dept. of Public Utility Control*, supra, 235 Conn. 346; in its decisions whether to grant licenses and certificates.

---

[11] The cable television company, however, did allege a legally protected interest under § 16-331 (i), which prohibits more favorable terms for new competitors. *United Cable Television Services Corp.* v. *Dept. of Public Utility Control*, supra, 235 Conn. 355.

The legislative history of No. 74-305, §§ 9 and 19, of the 1974 Public Acts (P.A. 74-305), which enacted § 19a-180, supports our conclusion. The debate regarding P.A. 74-305 focused on the need to regulate a system that had been criticized for abuses and inefficiency. Senator David Berry stated that "this bill establishes a state coordinated regional system for the delivery of emergency medical services throughout the entire state. It empowers the commission on hospitals and health care to plan, coordinate, and administer this system. It creates within the commission the position of deputy director of emergency medical services who would act as state coordinator for the system." 17 S. Proc., Pt. 6, 1974 Sess., pp. 2403–2404. Representative Virginia Connelly remarked that "swift passage of this bill will save hundreds of lives lost through death and disability because of inadequate or nonexistent emergency medical services." 17 H. Proc., Pt. 9, 1974 Sess., p. 4320. Representative Albert Webber added that "[t]he bill is designed as an exemplary product of the General Assembly's concern for all the interests and welfare of our citizens." Id., p. 4336.

In *Light Rigging Co.*, we did find a legislative intent to protect the existing competitive position of truckers carrying goods. In *United Cable Television Services Corp.*, we found no such intent for cable television companies providing programming to the community at large. In this case, concerning the transportation of patients requiring ambulance services, sometimes in emergency and life-threatening circumstances, it is very clear that the legislature did not intend to protect the competitive advantage or monopoly of an existing service provider, but, rather, the legislature sought to protect the welfare of those in the community in need of those services.

The plaintiff further argues that other language in § 19a-180 (a) indicates that the legislature intended for

competitors to participate in the process of determining whether a need for a new or expanded service exists. Section 19a-180 (a) also provides: "In considering requests for approval of permits for new or expanded medical emergency services in any region, the Office of Emergency Medical Services shall consult with the emergency medical services council of such region and shall hold a *public hearing* to determine the necessity for such services. Written notice of such hearing shall be given to current providers in the geographic region where such new or expanded services would be implemented . . . ." (Emphasis added.) This language was added to § 19a-180 (a) pursuant to No. 80-480, § 2, of the 1980 Public Acts. The legislative history regarding this language adds only that the formal notice of such a hearing would be given to "current providers in the region in order to give them an opportunity to come and comment on the expanded service." 23 S. Proc., Pt. 8, 1980 Sess., p. 2425, remarks of Senator Richard Schneller. We are not convinced that, because the legislature sought to provide a forum for competitors to express their views concerning a new applicant, the legislature intended to protect a competitive advantage for an existing ambulance service company. The legislature intended the department to regulate ambulance services so as to provide the safest, most efficient services possible to the general public, and this amendment ensured that the department would have as much information as possible when making its decisions. Furthermore, because members of the public may participate in the application process to the same extent as existing competitors, the amendment does not elevate existing competitors to an aggrieved status.

The plaintiff points out that § 19a-180-7 (d)[12] of the Regulations of Connecticut State Agencies requires the

[12] Section 19a-180-7 of the Regulations of Connecticut State Agencies provides: "In determining whether a need for a new or expanded emergency

department to consider "[t]he impact of the proposed service on existing services in the area." Given the language of the statute and its paramount purpose, the fact that the department proposed to consider the existence of such services and the impact on those services, along with the seven other factors, does not confer aggrievement on the plaintiff. When a statute and a regulation conflict, the statute must prevail. *Rose* v. *Freedom of Information Commission*, 221 Conn. 217, 229, 602 A.2d 1019 (1992); *Austin* v. *Housing Authority*, 143 Conn. 338, 348–49, 122 A.2d 399 (1956).

The plaintiff also argues that § 19a-180 (c) expressly authorizes it to appeal from the department's decision because that section provides that an "emergency medical service organization" may appeal. This argument is unavailing. Following the plaintiff's logic would remove the requirement that emergency medical organizations must be *aggrieved* by a decision of the department.

The plaintiff further contends that not allowing it to appeal would leave every decision of the department to grant new certificates and licenses free from judicial review and that the legislature could not have intended such a result. The legislature, however, entrusted the department with the role of establishing and maintaining a system of ambulance services to serve a vital and supremely important public need. *Our decision does not conflict with the goals of the legislature.*

medical service has been demonstrated, the Office [of Emergency Medical Services] shall consider the following factors:

"(a) The population to be served by the proposed service;

"(b) The geographic area to be served by the proposed service;

"(c) The volume of calls for the previous 12 months within such areas;

"(d) The impact of the proposed service on existing services in the area;

"(e) The potential improvement in service in the area including cost effectiveness and response times;

"(f) The location of the proposed principal and branch places of business in relation to health facilities and other providers;

"(g) The need for special services, if applicable; and

"(h) The recommendation of the any applicable regional council."

The plaintiff finally argues that, prior to the hearing on Access' application, the department routinely granted party status to existing competitors, and that the department's current position that existing competitors have no cognizable interest in the granting of a new license is contrary to its prior conduct. In reaching our decision here, we need not take a position on the prior conduct of the department. Moreover, even if the department had granted party status to the plaintiff, "[m]ere status . . . as a party or a participant in a hearing before an administrative agency does not in and of itself constitute aggrievement for the purposes of appellate review." *Hartford Distributors, Inc.* v. *Liquor Control Commission,* 177 Conn. 616, 620, 419 A.2d 346 (1979); see also *Light Rigging Co.* v. *Dept. of Public Utility Control,* supra, 219 Conn. 178; *Bakelaar* v. *West Haven,* supra, 193 Conn. 66.

We conclude that the trial court properly dismissed the plaintiff's appeal.

The judgment is affirmed.

In this opinion the other justices concurred.