[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an administrative appeal from a final decision of the defendant, Department of Public Health ("DPH"), brought pursuant to General Statutes § 4-183 of the Uniform Administrative Procedure Act CT Page 5188 ("UAPA"). The plaintiff, Connecticut Handivan, Inc. seeks to reverse the decision of the DPH. The plaintiff claims that the DPH incorrectly denied its application of March 1997 seeking twenty-four invalid coach licenses under General Statutes § 19a-180 (a). The court finds the issues in favor of the defendant.
The plaintiff is licensed by the Department of Transportation ("DOT") to provide wheelchair livery services in the state pursuant to General Statutes § 13b-105. On or about March 26, 1997, the plaintiff applied to the Office of Emergency Medical Services with the Department of Public Health for twenty-four invalid coach licenses. The application was amended on May 6, 1997 and deemed complete on May 23, 1997. Specifically, in its application, the plaintiff sought to convert sixteen of its existing DOT wheelchair livery licenses into invalid coach licenses and to acquire eight additional invalid coach licenses. As required by statute, the DPH convened a public hearing to determine the necessity in the region for the proposed expanded service. A hearing officer designated by the commissioner held hearings on the application on August 4, 1997, March 2 and March 12, 1998, during which time the plaintiff presented evidence in support of its application.[1] Two competing ambulance services, American Medical Response of Connecticut, Inc., and Hunter's Ambulance Service, Inc., were granted intervener status and allowed limited participation pursuant to General Statutes § 4-177a.
On August 28, 1998, the hearing officer issued a proposed memorandum of decision, concluding that the plaintiff failed to demonstrate the need for any invalid coaches and recommended that the plaintiff's application be denied. The plaintiff was afforded the opportunity to file briefs and exceptions to the proposed decision, and to present oral argument to the designee of the Commissioner. On November 6, 1998, the DPH issued a final decision adopting the hearing officer's proposed decision. Thereafter, this appeal from the DPH's final decision was timely filed.
Since the decision of the department denied the plaintiff's application for twenty-four invalid coach licenses, the court finds that the plaintiff is aggrieved within the meaning of General Statutes § 4-183. See New England Rehabilitation Hospital ofHartford, Inc. v. CHHC, 226 Conn. 105, 120 (1993).
At the outset, the court notes the "standard of review for all of the plaintiff's claims on appeal. Because [the court is] reviewing the decision of an administrative agency, [the court's] review is highly deferential. . . . Ordinarily, this court affords deference to the construction of a statute applied by the administrative agency CT Page 5189 empowered by law to carry out the statute's purposes. . . . Cases that present pure questions of law, however, invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . Furthermore, when a state agency's determination of a question of law has not previously been subject to judicial scrutiny . . . the agency is not entitled to special deference. . . . [I]t is for the courts, and not administrative agencies, to expound and apply governing principles of law. . . ." (Citations omitted; internal quotation marks omitted.) Bezzini v. Dept. of Social Services,49 Conn. App. 432, 436 (1998).
The court's "review of an agency's factual determination is constrained by General Statutes § 4-183(j), which mandates that a court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are . . . (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record. . . . This limited standard of review dictates that, with regard to questions of fact, it is neither the function of the trial court . . . to retry the case or to substitute its judgment for that of the administrative agency. . . . An agency's factual determination must be sustained if it is reasonably supported by substantial evidence in the record taken as a whole. . . . Substantial evidence exists if the administrative record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . This substantial evidence standard is highly deferential and permits less judicial scrutiny than a clearly erroneous or weight of the evidence standard of review. . . . The burden is on the plaintiffs to demonstrate that the [agency's] factual conclusions were not supported by the weight of substantial evidence on the whole record. . . ." (Brackets omitted; citations omitted; internal quotation marks omitted.) New England CableTelevision Assn., Inc. v. DPUC, 247 Conn. 95, 117-18 (1998).
In accordance with the General Statutes, both the DOT and the DPH have statutory authority to license vehicles used to transport non-ambulatory persons. Pursuant to General Statutes § 13b-103 (a), the DOT is authorized to issue permits for livery services if the DOT determines that the "public convenience and necessity will be improved by the operation and conduct of such livery services." The DOT may issue permits for the "express purpose of providing reasonable livery services to handicapped persons and elderly persons CT Page 5190 . . . where the department finds no existing service or that the existing service is not adequate to properly serve the special needs of elderly persons and handicapped persons." General Statutes §13b-105. In determining the special needs of the handicapped and elderly, the department may consider the convenience and physical and mental frailties of, and the care, safety and protection necessary for the best interests of, the handicapped and elderly and general public. General Statutes § 13b-105.
Pursuant to General Statutes § 19a-175 et seq., the DPH is given broad power to administer the state's emergency medical services program. General Statutes § 19a-176; see also General Statutes §19a-177 (1) (DPH to adopt every five years a state-wide plan for the coordinate delivery of emergency medical services); General Statutes § 19a-177 (2) (DPH to license or certify ambulance companies, ambulance personnel, and ambulance equipment and vehicles); General Statutes § 19a-177 (3) (DPH to conduct annual inventories of emergency medical services resources within the state); General Statutes § 19a-177 (6) (DPH to establish minimum standards and adopt regulations necessary to develop the components of an emergency medical service system including communications, transportation services, training of personnel, and emergency medical service facilities); General Statutes § 19a-177 (9) (DPH to establish rates for the conveyance of patients by licensed ambulance services). Pursuant to General Statutes § 19a-178, the DPH is responsible for the licensing and certification of ambulance services.
In accordance with General Statutes § 19a-180 (a), any person seeking to convert DOT licensed livery vehicles to DPH invalid coaches or seeking to acquire or expand DPH invalid coaches must obtain a license from the DPH.[2] "In considering requests for approvals of permits for new or expanded emergency medical services in any region, the commissioner shall consult with the Office of Emergency Medical Services and the emergency medical services council of such region and shall hold a public hearing to determine the necessity for such services." The burden is on the plaintiff to prove the need for new or expanded emergency medical services requested. Regs., Conn. State Agencies § 19a-180-6. In determining whether the plaintiff has demonstrated "necessity for such services", both parties agree that the DPH was required to consider section 19a-180-7
of the Regulations of Connecticut State Agencies. That regulation provides:
19a-180-7. Factors to be considered.
 In determining whether a need for a new or expanded emergency medical service has been demonstrated, the CT Page 5191 office shall consider the following factors:
(a) The population to be serviced by the proposed service;
(b) The geographic area to be served by the proposed service;
 (c) The volume of calls for the previous 12 month within such area;
 (d) The impact of the proposed service on existing services in the area;[3]
 (e) The potential improvement in service in the area including cost effectiveness and response times;
 (f) The location of the proposed principal and branch places of business in relation to health facilities and other providers:
(g) The need for special services, if applicable; and
(h) The recommendation of the applicable regional council.
In the present appeal, the plaintiff maintains that the Commissioner's decision was clearly erroneous in view of the reliable, probative and substantial evidence in the record in that the hearing officer ignored overwhelming and unconverted evidence of necessity for invalid coaches. Specifically, the plaintiff repeatedly maintains throughout its brief that the hearing officer "refused" to consider the plaintiff's data of service as a DOT licensed wheelchair livery as evidence of "need" for invalid coaches under § 19a-180-7 of the Regulations of Connecticut State Agencies. (Plaintiff's Brief, pp. 3, 8, 11, 12-14) According to the plaintiff, the hearing officer's denial of "this substantial and clear-cut evidence files in the face of common sense and natural justice." (Plaintiff's Brief, p. 8). In its reply brief, the DPH argues that the hearing officer did in fact consider the plaintiff's service record and based upon the plaintiff's DOT service record concluded that the plaintiff failed to establish the "need" for any invalid coaches under the applicable regulations.
The DPH in the findings of fact underlying its decision included specific findings with respect to the plaintiff's DOT service record. Indeed, the Commissioner's final decision contains twenty-one findings of fact pertaining the plaintiff's DOT service record. They are follows: CT Page 5192
 13. Applicant provides wheelchair-accessible livery service 24 hours each day, seven days each week. The vast majority of requests require transport between the hours of 5:00 a.m. and 7:00 p.m. on weekdays; on Saturdays, the volume is approximately half of its weekday volume; and, on Sundays, applicant receives few, if any, requests. Tr. 8/4/97, 70:19-24; App. Exh. 21.
 14. Excluding the estimated 2% of requests that do not require the transport of persons to or from medical facilities, between October 1, 1994 and September 30, 1995, applicant responded to approximately 11,372 requests for service; and, between October 1, 1995 and September 30, 1996, applicant responded to approximately 25,899 requests for service. This data establishes that applicant responded to 128% more requests for services in the `95-`96 fiscal year than it did in the `94-`95 fiscal year. These requests were serviced exclusively by DOT-licensed livery vehicles. H.O. Exh. 5, § 4.01; App. Exh. 3 and 4.
 15. Excluding the estimated 2% of requests that do not require the transport of persons to or from medical facilities, during the month of February of 1997, applicant responded to 2,740 requests for service. App. Exh. 4.
 16. Excluding the estimated 2% of requests that do not require the transport of persons to or from medical facilities, and including requests for services from the Veteran's Administration, during the months of October through December of 1997, applicant responded to an average of 4,139 calls per month. App. Exh. 21; App. rep. Br., p. 10.
 17. Excluding the 2% of requests that do not require transportation to or from medical facilities and requests for service from the Veteran's Administration, during October 1 through December 31, 1997, applicant provided service to an average of 3,482 requests each month. App. Exh. 21; App. Rep. Br. P. 10.
 18. Excluding the estimated 2% of requests that do not require the transport of persons to or from medical CT Page 5193 facilities, during February of 1998, applicant responded to approximately 3,611 requests for service. App. Exh. 23.
 19. Applicant only serviced the Veteran's Administrations between October 1, 1997 and January 31, 1998. Tr. 3/2/98, 131:14-23.
 20. The number of calls to which applicant responded in February of 1998, was less than the number of calls to which it responded in December of 1997, largely because applicant ceased providing service to the Veteran's Administration during the interim. Excluding the December Veteran's Administration calls and the 2% of calls that did not require transportation to or from a medical facility, the number of calls to which applicant responded increased from approximately 3,482 in December of 1997, to 3,611 in February of 1998. Tr. 3/2/98, 131:19-23; 137:15-17; App. Exh. 21, 23; App. Rep. Br. p. 10.
 21. Applicant responded to 32% more calls in February of 1998 than it did in February of 1997. App. Exh. 4 and 23.
 22. In February of 1998, applicant operated 25% more DOT-licensed wheelchair-accessible livery vehicles than it did in February of 1997 (i.e., in February of 1997, applicant operated sixteen such vehicles; commencing in October of 1998, and continuing to the present, applicant operates twenty such vehicles.) App. Exh. 4, 10, 23, 14, and 18.
 23. When applicant ceased providing services to the Veteran's Administration, it lost approximately 16% of its call volume.
 24. Considering that (1) in February of 1998, applicant responded to approximately 3,611 requests for services that required either a wheelchair accessible livery vehicle or an invalid coach for transport to or from a medical facility; (2) most services are provided between 5:00 a.m. and 7:00 p.m. during weekdays; (3) on Saturdays, the volume is half that of a weekday; and, (4) no requests may be received on Sundays, a preponderance of the evidence establishes that:
CT Page 5194 a. In February of 1998, applicant responded to approximately 903 requests each week, including 164 on an average weekday, and 82 on an average Saturday.
 b. Since applicant utilized twenty vehicles to respond to this call volume, each vehicle responded to approximately 45 calls each week, or 8 calls during each fourteen hour weekday, and 4 calls each Saturday.
 25. Applicant provides services that are reimbursed by private payors as well as through Medicaid. Services reimbursed by private payors constitute approximately 31% of applicant's business not considering the requests for services applicant received from the VA during the time period of October of 1997 and January of 1998. H.O. Exh. 5, § 4.01.
 26. During the time period of October 1 through December 31, 1997, applicant was unable to service 397 private payor requests, including 190 such requests in December of 1997. App. Exh. 20.
 27. While applicant estimates that the percentage of Medicaid requests it is unable to service is comparable to the percentage of private payor requests it is unable to service, it produced no evidence to support this claim. Applicant's assertion without any supporting evidence is an insufficient basis upon which to make a finding. App. Exh. 20, 22; Tr. 3/2/98, 133:12-23.
 28. During the time period of October 1 through December 31, 1997, applicant was unable to provide service for 88 requests from the Veterans Administration, including 40 such requests in December. App. Exh. 19.
 29. During October 1 through December 31, 1997, applicant provided service for a total of approximately 12,417 requests (including the Veteran's Administration requests and excluding the 2% of requests that do not require transportation to or from a medical facility). App. Exh. 20, 21; App. Rep. Br. p. 10.
 30. 1,982 of the 12,417 requests for service resulted from applicant's contract with the Veteran's CT Page 5195 Administration. App. Exh. 21; App. Rep. Br. p. 10.
 31. If applicant had not provided service to the Veteran's Administration during this time period, applicant could have provided service for an additional 1,982 requests from private payors and/or for services reimbursed by Medicaid.
 32. In addition to its request to convert sixteen of its livery vehicles to invalid coaches, applicant seeks authorization to operate eight new invalid coaches, in order to service it's claimed increased, demand as well as to have a 25% "ready reserve" available. Tr. 8/4/97, 87:4-24; 100:20-24.
 33. Applicant has provided timely and effective service, and enjoys a high degree of client satisfaction with its services. H.O. Exh. 3, § 4.03; App. Exh. 5, 6, 7, and 8; Tr. 8/4/97, 78:8-24; 81:5-24; and 82:1-24.
(Return of Record ("ROR"), Volume I, Decision, pp. 17-18.)
Based upon the plaintiff's DOT service record, the DPH concluded that the plaintiff failed to establish the necessity for any invalid coaches. The final decision provides:
 [A] preponderence of the evidence establishes that with applicant's current fleet of twenty DOT-licensed vehicles, applicant can adequately service its demand.
 In December of 1997, applicant responded to 4,139 calls utilizing twenty DOT-licensed vehicles, and refused 190 private payor and 40 VA [Veteran's Administration] requests. At the end of January of 1998, the VA contract terminated. During February of 1998, applicant responded to 3,611 requests. No evidence was proferred to establish whether applicant was unable to service any calls in February. Indeed, given the fact that applicant responded to 528 fewer calls in February than ti responded to the previous December, using the same number of vehicles, it is likely that applicant refused very few, if any, calls in February of 1998. Thus, the evidence establishes that, not only does applicant have an adequate number of vehicles to respond to its requests for service, but that it has the capacity to respond to 528 more calls than it actually received in February of 1998. CT Page 5196
 The conclusion that there is insufficient proof of need or necessity is further supported by finds that (1) applicant provides timely, effective service; and, (2) applicant is presently operating 25% more DOT-licensed vehicles than it did one year ago. Thus, while applicant's call volume between February of 1997 and February of 1998 increased by 32% (from 2,740 to 3,611 calls), applicant's four additional vehicles are sufficient to satisfy the demand as evidence by the 4,139 calls applicant serviced in December of 1997.
(ROR, Volume I, Decision, pp. 17-18.)
It is therefore clear to this court that the Commissioner did in fact consider the plaintiff's DOT service records in arriving at her conclusion. The DPH's findings with respect to the "need" criteria are supported by substantial evidence in the record. Accordingly, the plaintiff's argument that the hearing officer "refused" to consider the plaintiff's service record as evidence of need must fail.
The plaintiff next claims that its appeal should be sustained on the ground that the DPH, acting through its hearing officer, exceeded its statutory authority, acted arbitrarily, capriciously and in abuse of its discretion. Specifically, the plaintiff takes issue with the hearing officer's subordinate legal conclusion, which states: "Additionally, applicant was awarded the DOT authorizations only after DOT made a determination of special need pursuant to § 13b-105
of the Connecticut General Statutes. It is this hearing officer's recommendation that this Department not disturb determinations made by the DOT in previously granting applicant authority to operate twenty wheelchair-accessible livery vehicles under its authority." (ROR, Volume I, Decision, p. 15.) According to the plaintiff, this conclusion by the DPH adds an extra legal standard of deference to another agency in establishing need under the DPH's regulations, §19a-180-7.
Based upon the evidence contained in the record, the DPH also concluded: "[A] preponderance of the evidence establishes that there is no need or necessity for the award of any invalid coach authorizations. By utilizing its DOT-licensed wheelchair accessible vehicles, applicant timely and effectively satisfies its request for service." (ROR, Volume I, p. 15.) It is clear that the DPH had substantial evidence in the record upon which to base its conclusion that the plaintiff failed to meet its burden of establishing need for eight new invalid coaches. The DPH's findings of fact in its decision CT Page 5197 deal extensively with the DOT's service record.
The record indicates that the plaintiff was operating twenty-five percent more DOT licensed vehicles than it had in the previous year. Between February of 1997 and February 1998, the plaintiff's call volume increased by thirty-two percent, from 2,740 calls to 3,611 calls. In December of 1997, the plaintiff was granted four additional DOT livery licenses; thus, enabling the plaintiff to sufficiently service this added increase in call volume. The record further indicates that in December of 1997, the plaintiff serviced a total of 4,139 calls utilizing its current fleet of twenty DOT vehicles and refused 190 private payor calls and 40 Veteran's Administration ("VA") requests. In January of 1998, the plaintiff's contract with the VA was terminated. During February of 1998, the plaintiff responded to 3,611 calls for service. Therefore, the plaintiff would have the capacity to meet the need for non-emergent transportation services without additional vehicles since the plaintiff had a decrease in service calls in February of 1998, with the same number of vehicles and absent a contract with the VA.
Here, there is substantial evidence in the record to support the agency's determination with respect to the "need" criteria. The fact that the DPH made an additional, subordinate conclusion in assessing need does not amount to a finding that the substantial rights of the plaintiff have been prejudiced. So long as the record presents evidence that supports one reason given by the agency for its decision, the decision must stand. Huck v. Inland Wetland and Watercourses Agency,203 Conn. 525, 539-40 (1987).
The plaintiff also contends that the hearing officer unreasonably failed to credit the plaintiff's sworn testimony as evidence of the percentage of Medicaid calls it was unable to service.
As to this issue, the record reflects that initially the plaintiff did not provide the hearing office with data regarding the number of calls that the plaintiff was unable to service. The hearing officer requested that the plaintiff submit documentation as to the number of calls the plaintiff received so that the hearing officer would be able to determine the total volume of calls received by the plaintiff. In response to the hearing officer's request, the plaintiff offered evidence of 88 calls for service from the Veteran Administration that were passed on to other providers, 1,393 private payor requests that were transferred to other providers in 1997 and further provided that records were not maintained by the plaintiff for Medicaid transports that were denied.. (ROR, Volume II, Plaintiff's Exhibits 19, 20 and 22.) The plaintiff further provided, CT Page 5198 in an affidavit from Mark J. Panico, that the percentage of Medicaid calls it was unable to service was the same as the percentage of private calls it was unable to service. The hearing officer, however, stated that she "was unwilling to base a finding of fact on applicant's assertion, without any supporting documentation, that it is unable to respond to the same percentage of medicaid calls as private payor calls."
Assessing the credibility of witnesses is a matter within the province of the agency. Jaffe v. State Department of Health,135 Conn. 339, 343 (149) "[A]n administrative agency is not required to believe any witness, even an expert, nor is it required to use in any particular fashion any of the materials presented to it. . . ."Huck v. Inland Wetlands Watercourses Aaency, 203 Conn. 525, 542
(1987). Moreover, the agency's evaluation and interpretation of the evidence before it must be sustained unless the conclusions are unreasonable. Connecticut Light Power Co. v. DPUC, 216 Conn. 627,644 (1990).
Here, the DPH reasonably concluded that approximation by the plaintiff as to the number of transferred calls, absent support documentation, was not credible. The DPH was free to weigh the credibility of the witness. Norwich v. Norwich Fire Fighters,173 Conn. 220, 214 (1977). It is not the function of this court to retry the case or substitute its judgment for that of the administrative agency.
The plaintiff also argues that the DPH decision is inconsistent with the law and legal precedent set forth by the Supreme Court inMed-Trans of Connecticut, Inc. v. DPH, 242 Conn. 152 (1997). The plaintiff maintains that by refusing to recognize the plaintiff's DOT service data as proof of "need," the DPH protected the competitive advantage of existing ambulance companies in direct contravention ofMed-Trans of Connecticut, Inc. v. DPH, supra. In that case, the plaintiff, Med Trans of Connecticut, Inc., appealed from a final decision of the DPH granting a competitor a license to provide new ambulance services in the Stamford and Greenwich areas. The trial court dismissed the plaintiff's case determining that the plaintiff was not aggrieved by the DPH's decision. The Supreme Court upheld the trial court's dismissal of the plaintiff's appeal. According to the Supreme Court, General Statutes § 19a-180 "requires the department to issue a license to a qualified applicant without consideration of the effects on competition. We conclude that § 19a-180 requires the department primarily to protect the public at large and not the interests of individual competitors . . . in its decisions whether to grant licenses and certificates." (Citations omitted.) Med-Trans ofCT Page 5199Connecticut, Inc. v. DPH, supra, 242 Conn. 165. The Supreme Court found that, to the extent that § 19a-180-7 (d) of Regulations of Connecticut State Agencies is to be read as requiring consideration of the impact of the expanded service on other providers, it is inconsistent with General Statutes § 19a-180.
Again, the court must reiterate that the DPH did in fact consider the plaintiff's DOT service record in assessing "need" under §19a-180-7 of the Regulations of Connecticut State Agencies. As previously stated above, there is substantial evidence in the record as a whole to support the agency's conclusion. The record further provides that the hearing officer, in denying issuance of invalid licenses to the plaintiff, did so without consideration of the effects on competition in accordance with Med-Trans of Connecticut,Inc. v. DPH, supra, 242 Conn. 168. The hearing officer reasonably concluded that the plaintiff's primary purpose in seeking the new and additional invalid licenses was to protect its own business interest and that this purpose was simply not one of the factors to consider in assessing "need" under the regulation.
Lastly, the plaintiff argues that the DPH decision is inconsistent with the DPH's own precedent set forth in Theo's TransportationService, Inc. and Ambassador Wheelchair Services, Inc.[4] In determining whether a need for a new or expanded emergency medical service has been demonstrated, the agency is required to consider seven factors set forth in § 19a-180-7 of the Regulations of Connecticut State Agencies. The determination of "need" is assessed in each individual case and a showing of need is fact specific. Accordingly, the DPH is not bound by prior determinations of "need" found for other applicants. In the present case, the DPH's decision is, in accordance with its authority, supported by substantial evidence on the whole record and represents an appropriate exercise of the DPH's discretion.
Accordingly, based on the foregoing, the decision of the DPH is affirmed and the plaintiff's appeal is hereby dismissed.
___________________ Michael Hartmere, Judge