[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] CORRECTED MEMORANDUM OF DECISION
In this case, plaintiff Michelle DiLieto has sued eight defendant health care providers — one medical group,[1] five physicians,[2] Yale-New Haven Hospital ("Hospital"), and Yale University — for malpractice in connection with the care, advice and treatment they gave to her before, during and after she underwent surgery at the defendant Hospital on May 3, 1995. In her Revised Third Amended Complaint ("Complaint") dated February 4, 1999, the plaintiff claims, inter alia, that one or more of the defendants committed malpractice in the following ways: by negligently analyzing a tissue specimen taken from her uterus as consistent with endometrial stromal sarcoma, and thereby misdiagnosing her as suffering from uterine cancer; by negligently advising her, on the basis of that misdiagnosis, to undergo a total abdominal hysterectomy and bilateral salpingo-oopherectomy; by negligently ignoring the results of an intraoperative frozen section analysis showing that she was not CT Page 1351 suffering from cancer, and thus proceeding, for no valid medical reason, to remove her pelvic lymph nodes; by negligently assigning different, less qualified medical personnel to analyze her tissue specimen and perform surgery upon her than she had been promised before those procedures were conducted; and by negligently failing to inform her, in the wake of her surgery, that she had never had cancer. Among the injuries and losses for which the plaintiff now seeks to recover damages as a result of the defendants' alleged malpractice are: the permanent loss of her reproductive organs and pelvic lymph nodes; the premature onset of menopause; disfigurement, including scarring of her abdominal and genital anatomy; physical pain, resulting principally from damage to her genital femoral nerve sustained when her lymph nodes were surgically removed; and associated mental anguish, pain and suffering, and loss of capacity for the enjoyment of life.
Now pending before this Court for decision are the defendants' motions to dismiss for lack of subject-matter jurisdiction and parallel motions by the plaintiff and the trustee of her bankruptcy estate, Attorney Michael J. Daly, to add or substitute the trustee as party plaintiff. The parties have briefed and argued each motion extensively, based in part on evidence presented on the motions to add or substitute in a two-day hearing before the Court.[3] For the following reasons, the Court concludes that the plaintiff's and trustee's motions to substitute should be granted under the authority of General Statutes § 52-109, and therefore that the defendants' motions to dismiss should be denied.
 The Court's Authority to Order Substitution of Plaintiffs Instead of Ordering Dismissal for Lack of Subject-Matter Jurisdiction
The longstanding rule in Connecticut is that
 "Whenever the absence of jurisdiction is brought to the notice of the court or tribunal, cognizance of it must be taken and the matter passed upon before it `can move one further step in the cause; as any movement is necessarily the exercise of jurisdiction.' Rhode Island v. Massachusetts, 12 Pet. (37 U.S.) 657, 717 [1838]; Denton v. Danbury, 48 Conn. 368, 372 [1880]." Woodmont Assn. v. Milford, 85 Conn. 517, 524, 84 A. 307 (1912). The point has been frequently made. See, e.g., Kohn Display Woodworking Co. v. Paragon Paint Varnish Corporation, 166 Conn. 446, 448, 352 A.2d 301 (1974); East Side Civic Assn. v. PlanningCT Page 1352 Zoning Commission, 161 Conn. 558, 559, 290 A.2d 348 (1971); Carten v. Carten, 153 Conn. 603, 610, 219 A.2d 711 (1966); Felletter v. Thompson, 133 Conn. 277, 280, 50 A.2d 81 (1946) (Maltbie, C.J.)
Baldwin Piano Organ Co. v. Blake, 186 Conn. 295, 297-98,441 A.2d 183 (1982). The continuing vitality of this rule is undoubted, for in 1996 our Supreme Court expressly reaffirmed it by an en banc decision in Federal Deposit Ins. Corp. v. Peabody,N.E., Inc., 239 Conn. 93, 99, 680 A.2d 1321 (1996) (quoting and relying on the foregoing passage from Baldwin Piano Organ Co.v. Blake, supra).
It matters not, for the purpose of the "decide jurisdiction first" rule, how or by whom the question of jurisdiction is raised. Woodmont Assn. v. Milford, supra, 85 Conn. at 524;Felletter v. Thompson, supra, 133 Conn. at 280. Since subject-matter jurisdiction cannot be conferred by waiver or consent; Samson v. Bergin, 138 Conn. 306, 309, 84 A.2d 273 (1951); the Court must address the question, suo motu if necessary, even in the absence of a motion. Felletter v. Thompson, supra,133 Conn. at 280.
A classic situation in which a court lacks subject-matter jurisdiction is when the party prosecuting an action lacks standing to do so. McGee v. Dunnigan, 138 Conn. 263, 83 A.2d 491
(1951); Nader v. Altermatt, 166 Conn. 43, 59, 347 A.2d 89 (1974);Crone v. Gill, 250 Conn. 476, 477 n. 1, 736 A.2d 131 (1999) (dismissing a writ of error challenging an order disqualifying an attorney from representing a criminal defendant because the attorney, who filed the writ in his own name as plaintiff in error, had no standing to challenge the disqualification order).
 "Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless [one] has, in an individual or representative capacity, some real interest in the cause of action. . . . (Internal quotation marks omitted.) Stamford Hospital v. Vega, 236 Conn. 646, 657, 674 A.2d 821 (1996). "Standing is established by showing that the party claiming it is authorized by statute to bring suit or is classically aggrieved." Steeneck v. University of Bridgeport, 235 Conn. 572, 579, 668 A.2d 688 (1995). The fundamental test for establishing classical aggrievement is well settled: "[F]irst, the party claiming aggrievement must successfully demonstrate a specific personal and legal interest in the subject matter of the CT Page 1353 decision. . . ." (Internal quotation marks omitted.) Med-Trans of Connecticut, Inc. v. Dept. of Public Health Addiction Services, 242 Conn. 152, 158-59, 699 A.2d 142 (1997); accord State Medical Society v. Board of Examiners in Podiatry, 203 Conn. 295, 299-300, 524 A.2d 636 (1987). Second, the "party claiming aggrievement also must demonstrate that its asserted interest has been specially and injuriously affected in a way that is cognizable by law." United Cable Television Services Corp. v. Dept. of Public Utility Control, 235 Conn. 334, 343, 663 A.2d 1011 (1995).
Crone v. Gill, supra, 250 Conn. at 479-80.
Under this test, a total stranger to a legal controversy has no standing to pursue an action arising from it because he obviously has nothing to gain or lose by its final resolution. McGee v.Dunnigan, supra, 138 Conn. at 267. However, the test applies with equal force to one who formerly had an interest in the controversy but since has lost, transferred or forfeited it, for he, like a total stranger, has no present legal interest in the outcome of any related case. Therefore, whenever it comes to the Court's attention that the plaintiff in a case before it has no present legal interest in the outcome of the case, the Court must immediately raise and decide the question of its own jurisdiction.
The defendants have moved this Court to dismiss this case for lack of subject-matter jurisdiction. As grounds for their motion, they have alleged and proved that prior to filing the case, the plaintiff and her husband, Robert DiLieto, filed a joint petition for bankruptcy under Chapter 7 of the Federal Bankruptcy Act. As of the moment when the plaintiff and her husband filed for bankruptcy, claim the defendants, all of the plaintiff's rights of action against them became the exclusive property of the bankruptcy estate, to be exercised on behalf of the estate by the bankruptcy trustee. On that basis, the defendants claim that the Court must dismiss this case for lack of subject-matter jurisdiction because the plaintiff lacks standing to pursue it for any purpose.
The plaintiff opposes the defendant's motion to dismiss on several grounds. First, she contends that even if the prosecution of her present claims must be controlled or participated in by the bankruptcy trustee, she retains a justiciable legal interest in those claims because she has claimed an exemption, which the Bankruptcy Court has not yet ruled on, with respect to a portion CT Page 1354 of those claims. Second, she insists that she has a substantial personal interest in the outcome of this case because she personally will recover the full amount of any judgment against these defendants that exceeds the amount of her indebtedness. Third, she joins the trustee in arguing that even if she presently has no justiciable legal interest in this case, the trustee should be substituted for her as party plaintiff because his participation in the case, as the real party in interest, is necessary to determine the real matter in dispute.
The Court is persuaded by the defendants that neither any possible exemption that the Bankruptcy Court may grant the plaintiff for a portion of the pending claims nor any possible recovery of a judgment in excess of her indebtedness to her creditors gives the plaintiff standing to prosecute this case on her own behalf.[4] Accordingly, the Court must grant the defendants' motions to dismiss unless it finds that the bankruptcy trustee, as legal representative of her bankruptcy estate, may properly be substituted as party plaintiff.
The plaintiff's and the trustee's motions to substitute are based on Connecticut's "wrong plaintiff" statute, General Statutes § 52-109. Originally enacted as part of the Practice Act in 1879, this statute provides, now as when it was enacted, that:
 When any action has been commenced in the name of the wrong person as plaintiff, the court may, if satisfied that it was so commenced through mistake, and that it is necessary for the determination of the real matter in dispute so to do, allow any other person to be substituted or added as plaintiff.
On its face, Section 52-109 appears to contemplate that when the conditions set forth therein are met, a lawsuit "commenced in the name of the wrong person" — presumably a person who has no present interest in or legal right to prosecute the lawsuit — can be saved from dismissal by the substitution of "any other person" as party plaintiff. The two conditions that must be met to invoke the statutory remedy of substitution are: first, that the action was "commenced in the name of the wrong person by mistake;" and second, that the proposed substitution "is necessary for the determination of the real matter in dispute." Id.
What is puzzling about this statute on first reading is the seeming impossibility of invoking its protections without first causing the court to dismiss for lack of subject-matter CT Page 1355 jurisdiction. Proof that an action was commenced "in the name of the wrong person" would seem inexorably to establish that the original plaintiff has no standing to prosecute the action. Recalling the foregoing discussion of subject-matter jurisdiction, and in particular of the Court's obligation to resolve that issue as soon as it arises, one wonders how a court, when presented with evidence that a plaintiff without standing has commenced an action, can even consider a motion to substitute without first dismissing the case for lack of subject-matter jurisdiction. Strict application of the "decide jurisdiction first" rule would appear to require dismissal whenever the statute's criteria are satisfied.
In fact, a series of decisions from our Appellate Court have established that in spite of the "decide jurisdiction first" rule, a case can be saved from dismissal for lack of subject-matter jurisdiction by the granting of a proper motion to substitute under General Statutes § 52-109 or its functionally identical counterpart in Practice Book § 9-20 (formerly § 101).[5] First, in Johndrow v. State, 24 Conn. App. 719, 722
n. 1, 591 A.2d 815 (1991), where the Court invoked the "decide jurisdiction first" rule in affirming the dismissal of an insurer's improper intervention under General Statutes §31-293[6] despite its timely filing of a motion to substitute the plaintiff's employer as a proper intervenor, the Court upheld the rejection of the proposed substitution because it did not meet the requirements of Practice Book § 101. The Johndrow Court reasoned, in the language of the rule and parallel statute, that substitution of the employer for the insurer was not "necessary for the determination of the real matter in dispute" because
 [t]he real issue disputed in this action is the defendant's liability in tort and not the indemnification of another. Accordingly, this section does not apply to this case.
Id. The obvious implication arising from this observation is that the result might have been different had the proposed substitution been for the real party in interest — the original plaintiff, instead of a mere intervenor.
Later, in Wickes Mfg. Co. v. Currier Electric Co.,25 Conn. App. 751, 760, 596 A.2d 1331 (1991), the Appellate Court upheld a trial court's order permitting the substitution of a new plaintiff for the original plaintiff in a breach of contract action even though the record clearly showed that the original CT Page 1356 plaintiff had never had standing to bring the action. There, the action was prosecuted for six years in the name of the original party to a contract even though that party had ceased to exist before the action was commenced. Even so, the Court approved the substitution of one of the original plaintiff's corporate successors for the following reasons, which brought it within the scope of Section 52-109: first, that the commencement of the action in the name of the original plaintiff had been a "mistake;" and second, that the substituted party, which owned all the rights to the original plaintiff's claim, was the real party in interest with respect to that claim, and thus was "necessary for a determination of the real matter in dispute."Wickes Mfg. Co. v. Currier Electric Co., supra,25 Conn. App. at 760. At no point in the Court's decision did it suggest that the action should have been dismissed because of the original plaintiff's non-existence, and resulting lack of standing.
Finally, in 1993, the Appellate Court issued two decisions which expressly noted that one proper use of our liberal substitution statutes is to cure an original plaintiff's lack of standing by substituting the real party in interest as party plaintiff. Thus in Federal Deposit Ins. Corp. v. RetirementManagement Group, Inc., 31 Conn. App. 80, 84-85, 623 A.2d 517
(1993), the Court explained that:
 Our rules of practice . . . permit the substitution of parties as the interests of justice require. General Statutes §§ 52-108. 52-109; Practice Book §§ 100, 101; see also United States Trust Co. v. DiGhello, 179 Conn. 246, 247 n. 1, 425 A.2d 1287 (1979); Hagearty v. Ryan, 123 Conn. 372, 195 A. 730 (1937); Wickes Mfg. Co. v. Currier Electric Co., 25 Conn. App. 751, 760-61. 596 A.2d 1331 (1991). These rules are to be construed so as to alter the harsh and inefficient result that attached to the mispleading of parties at common law. See Hagearty v. Ryan, supra, 375-76. General Statutes § 52-108 and Practice Book § 100 provide that "no action shall be defeated by the nonjoinder or misjoinder of parties." General Statutes § 52-109 and Practice Book § 101 allow a substituted plaintiff to enter a case "[w]hen any action has been commenced in the name of the wrong person as plaintiff. . . ." Both rules, of necessity, relate back to and correct, retroactively, any defect in a prior pleading concerning the identity of the real party in interest. In the context of analogous rules of federal civil procedure, it has been observed that "[w]here the change is made on the plaintiff's side to supply an indispensible party or to correct a mistake in ascertaining theCT Page 1357 real party in interest, in order to pursue effectively the original claim, the defendant will rarely be unfairly prejudiced by letting the amendment relate back to the original pleading."
F. James G. Hazard, Civil Procedure (2d Ed. 1977) § 5.7, pp. 167-68. "As long as [the] defendant is fully apprised of a claim arising from specified conduct and has prepared to defend the action, his ability to protect himself will not be prejudicially affected if a new plaintiff is added, and he should not be permitted to invoke a limitations defense. . . . Thus, an amendment substituting a new plaintiff [will] relate back if the added plaintiff is the real party in interest." 6A C. Wright. A. Miller M. Kane, Federal Practice and Procedure § 1501, pp. 154-57; see also Health Research Group v. Kennedy, 82 F.R.D. 21
(D.D.C. 1979) (substitution of real party in interest as plaintiff permitted to cure lack of standing of original plaintiff). An amendment to pleadings will relate back to its filing, at the very least, and back to the beginning of the action under appropriate circumstances. [Citations omitted]. We see no reason why our general policy with respect to pleadings should not also apply in the context of the substitution of a plaintiff.
(Emphasis added). Thereafter, in Investors Mortgage Co. v. Rodia,31 Conn. App. 476, 483-84, 625 A.2d 833 (1993), the Court quoted the foregoing passage in support of its conclusion that a substituted plaintiff could properly prosecute a motion for deficiency judgment even though it had not presented the original motion for strict foreclosure.
By repeatedly citing Health Research Group v. Kennedy, supra, for the proposition that "substitution of [the] real party in interest as plaintiff [is] permitted to cure lack of standing by original plaintiff," the Court explicitly acknowledged the propriety of the course it had taken in Wickes, to wit: approving the substitution of a real party in interest for an original plaintiff without standing who was named through mistake when the action was commenced.
What the foregoing cases make clear is that a court may order substitution of plaintiffs in lieu of dismissal whenever the statute's conditions are met. The legislature's provision of this statutory remedy would be completely undermined by any rule requiring the immediate dismissal for lack of subject-matter jurisdiction of any action commenced in the name of the wrong person as plaintiff. The statute, as an exercise of the legislature's constitutional authority to determine this Court's CT Page 1358 jurisdiction; Constitution of Connecticut, Article Fifth § 1; must be seen as an extension of that jurisdiction for the limited purpose of deciding a proper motion to substitute.
This, in fact, is the very same analysis which our Supreme Court has used to interpret a similar savings statute inFelletter v. Thompson, supra, 133 Conn. 277. The statute there in question was Connecticut's so-called "wrong court" statute, then codified as § 5485 of the General Statutes. Later codified, before its repeal in 1977, as General Statutes § 52-32, the statute provided in relevant part as follows:
 Any civil action brought to the wrong court may, upon motion, be removed to a court having jurisdiction, either before or after the filing of a plea in abatement.
The first issue raised in Felletter was whether, in light of Connecticut's rule that jurisdictional challenges must be resolved before any other issue in the case are considered, the "wrong court" can ever order transfer to the "right court" of a case over which it has no subject-matter jurisdiction. The second issue, raised by the special procedural posture of the case before it, was whether, if the "wrong court" could so act, it could do so when its jurisdiction was challenged by a motion to erase instead of a plea in abatement.[7]
The Supreme Court, in an opinion by Chief Justice Maltbie, affirmed the trial court's decision to order a transfer for the following reasons. First, it acknowledged the general rule that when a court's subject-matter jurisdiction is called into question, the court must take no further action until the jurisdictional challenge is resolved. Id. at 280. Then, consistent with that rule, it interpreted the "wrong court" statute to grant every court to which a civil action was wrongly brought the limited power to order removal of that action to the "right court" even though it otherwise lacked jurisdiction over the action. On this score it reasoned as follows:
 Section 5485, in referring to any civil action "brought to the wrong court" necessarily includes an action brought to a court without jurisdiction to determine it. . . . [T]he effect of 5485 is to extend the jurisdiction of the court over a case which it would not have power to determine so far as to authorize it to order a removal. Wooley v. Williams, [105 Conn. 671, 673, 136 A. 583 (1927)]. CT Page 1359
Felletter v. Thompson, supra, 133 Conn. at 280.
Against that background, the Court concluded that the legislature's true purpose for referencing pleas in abatement in the "wrong court" statute was not to limit the "wrong court's" power of removal to cases where jurisdiction was challenged by a plea in abatement. Instead, observing that the typical, statutorily prescribed manner for challenging a court's jurisdiction was to file a plea in abatement, it found that the legislature had authorized removal in all cases, regardless of how the "wrong court's" jurisdiction was called into question:
 There is nothing in the nature of the proceeding which, even if the quoted words [referencing pleas in abatement] were omitted, would prevent the court from ordering a removal after a plea in abatement had been filed but before it had been acted upon; and that is also true as regards a motion to erase the case for want of jurisdiction. The mere filing of the motion does not destroy the jurisdiction given the court by the statute. If that filing would prevent the removal, it would lie in the power of a party in many instances to defeat the purpose of the statute by raising the issue of jurisdiction in that way, rather than by plea; and the legislature could not have intended such a result. We cannot read the quoted words as limiting the right of removal to cases where a plea is filed, or interpolate into the statute a restriction that a case cannot be removed merely because a motion to erase on the ground of lack of jurisdiction has been filed but has not been acted upon. The trial court properly ordered the removal of the action to the Court of Common Pleas[.]
Id. at 280-81.
The obvious purpose of the "wrong court" statute was to save parties and the courts from the waste and inefficiency of common-law pleading. To that end, it permitted the transfer and continuation of cases brought initially to a court without subject-matter jurisdiction even though to do so obviously saved them from certain dismissal. The Felletter Court's interpretation of the statute gave full effect to its remedial provisions without requiring judges to act in the absence of subject-matter jurisdiction.
This Court is persuaded that the same analysis necessarily applies to Section 52-109. An action commenced by the wrong CT Page 1360 plaintiff, like an action brought to the wrong court, is an action over which the court lacks subject-matter jurisdiction. Even so, like an action brought to the wrong court, it is an action over which a court may properly exercise jurisdiction for the limited purpose of determining if the action should be saved from dismissal by the substitution of plaintiffs. By ordering substitution of plaintiffs instead of dismissal when the statute's conditions are satisfied, a court fulfills the intent of the legislature by eliminating the harshness and inefficiency of common-law pleading. Hagearty v. Ryan, supra,123 Conn. at 375-76. Here, then, the Court can properly consider the motions to substitute notwithstanding the pendency of the defendants' motions to dismiss.
 The Substantive Requirements of General Statutes § 52-109
Before it can decide if the proposed substitution should be permitted in this case, the Court must determine the true meaning of the statute's operative terms. First, it must determine what the statute's framers intended by limiting the substitution of plaintiffs to actions commenced in the name of the wrong person "through mistake." On this score, the Court must inquire, more particularly, if the framers intended to limit relief under the statute to cases involving particular kinds of mistakes or mistakes resulting from particular operations of mind. Second, the Court must determine what the framers intended by limiting the substitution of plaintiffs to cases where it is "necessary for the determination of the real matter in dispute." Only then, upon concluding these inquiries, can the Court decide if the statute has been satisfied on the record before it.
Turning to the second issue first, the Court has already cited controlling Appellate Court authority establishing that the purpose of Section 52-109 is to ensure that any person who prosecutes a claim is the real party in interest with respect to that claim. Federal Deposit Ins. Corp, v. Retirement ManagementGroup, Inc., supra, 31 Conn. App. at 84; Investors Mortgage Co.v. Rodia, supra, 31 Conn. App. at 484. The "real party in interest" with respect to a claim is the true legal owner of the claim — one who has a sufficient legal interest in the claim to have standing to pursue it. See generally Richards v. Planning Zoning Commission, 170 Conn. 318, 327, 365 A.2d 1130 (1976) (holding that a board of education was a "real party in interest" with respect to a certain property at issue in a special permit application, and thus had standing to make and prosecute that CT Page 1361 application). Substitution of the "real party in interest" to pursue a claim is obviously "necessary for the determination of the real issue in dispute" whenever the original party lacks standing to pursue it. Poly-Pak Corp. of America v. Barrett,1 Conn. App. 99, 102, 468 A.2d 1260 (1983). In such circumstances, without the requested substitution, the court would have no subject-matter jurisdiction over the case, and any judgment it might render would be null and void.
Here, for the reasons previously stated, the one true owner of the plaintiff's claims against these defendants is the plaintiff's bankruptcy estate. Even though this suit was not instituted for almost one year after the plaintiff filed for bankruptcy, those claims, which accrued one year before the bankruptcy was opened, became the property of the estate as soon as the bankruptcy petition was filed. Plainly, if the "real matter at issue" in this case is to be determined, the Court must first have subject-matter jurisdiction. That, in turn, depends upon the presence and participation of the bankruptcy trustee, who alone has standing to prosecute the claims. The Court must therefore grant the pending motions to substitute if it is satisfied that the plaintiff commenced this action in her own name "through mistake."
In interpreting any statute, this Court must be "guided by settled principles of statutory construction that assist [it] in ascertaining the intent of the legislature. . . . The legislative intent is to be discerned by reference to the language of the statute, its legislative history and surrounding circumstances, the policy the [statute] was designed to implement, and the statute's relationship to the existing legislation and common law principles governing the same subject matter." (Citations omitted; internal quotation marks omitted) Hunte v. Blumenthal,238 Conn. 146, 152, 680 A.2d 1231 (1996) (quoted in FederalDeposit Ins. Corp. v. Peabody, N.E. Inc., 239 Conn. 93, 101,680 A.2d 1321 (1996)).
The term "through mistake" is not defined in the text of Section 52-109, nor has it ever been defined for the purpose of that statute in any appellate decision. Even so, the task of interpreting it can readily be accomplished in two ways. First, though the statute has no "legislative history," as we now use that term, we know from case law that it was first enacted as part of the Practice Act of 1879, whose essential purpose is well documented and understood. That purpose, as described by our CT Page 1362 Supreme Court in Bowen v. National Life Assoc., 63 Conn. 460,476, 27 A. 1059 (1893), was to "radically change[ ] the old practice with reference to joinder, admission and dropping of the parties to a suit[.]"
In particular, the drafters of the Practice Act sought "to alter the harsh and inefficient result that attached to the mispleading of parties at common law." Federal Deposit Ins. Corp,v. Retirement Management Group. Inc., supra, 31 Conn. App. at 84. Under that practice, as described in Hagearty v. Ryan, supra,123 Conn. at 375-76, any action prosecuted by a person who lacked or lost standing was always subject to immediate abatement even if the real party in interest was ready, willing and able to prosecute it. The result of this mandatory abatement rule was that a real party in interest who wished to pursue an abated action would either have to file a new action or, if the time to do so had expired, file a motion for a new trial on grounds of mispleading. In either case, much time, money and energy were required to file, pursue and adjudicate a new action or a new trial motion that could easily be remedied if the original trial court were simply empowered to cure the defect.
When any action failed at common law because of mispleading, it was well established by 1879 that a new trial would not be granted unless the mispleading "came about through fraud, accident or mistake, unconnected with any negligence or inattention upon [the petitioner's] part." DiBlasi v. DiBlasi,116 Conn. 699, 700, 163 A. 473 (1932) (citing and quoting fromDay v. Welles, 31 Conn. 344, 349 (1863)). A negligent mistake, for the purpose of this rule, is one "of which reasonable diligence on the[ ] part [of the mistaken party] would have apprised [him]." Hayden v. Wallace Sons Mfg. Co.,100 Conn. 180, 187, 123 A. 9 (1923). Hence, though the "wrong plaintiff" statute was clearly designed to alter the harsh and inefficient procedural consequences of the common law by allowing real parties in interest to save their mispleaded lawsuits in the courts where they were originally brought, it just as clearly conditioned the right to such relief on the same showing of mistake that was required for the granting of a new trial. Accordingly, this Court concludes that to prevail on a motion to substitute under Section 52-109, a plaintiff must prove that the mistake which led him to misplead in the name of the wrong person did not result from his own failure to exercise reasonable diligence to know the truth. CT Page 1363
A second source of insight as to the true meaning of the phrase "through mistake," as it appears in Section 52-109, can be found in two cases interpreting another statute of ancient vintage, where the same words were used in a comparable context before 1879. The statute in question, now codified in amended form at General Statutes § 52-560, provided in relevant part as follows:
 Any person who cuts, destroys or carries away any trees, timber or shrubbery, standing or lying on the land of another or on public land, without license of the owner, and any person who aids therein, shall pay to the party injured . . . three times the reasonable value of . . . [the] tree, timber, or shrubbery; but, when the court is satisfied that the defendant was guilty through mistake and believed that the tree, timber or shrubbery was growing on his land, . . . it shall render judgment for no more than its reasonable value.
(Emphasis added). Originally enacted in 1821, this statute was interpreted by the Connecticut Supreme Court in Petroman v.Anderson, 105 Conn. 366, 135 A. 391 (1926), and by the Superior Court, in an opinion by Judge (later Chief Justice) House, inDoran v. Rugg, 22 Conn. Sup. 189, 164 A.2d 859 (1960)
In Petroman, the Supreme Court usefully observed what might be thought obvious about any statute establishing an equitable defense of mistake: that the mistake must be an "honest mistake and belief." Id. at 371. In Doran v. Rugg, Judge House elaborated on this definition by noting that "[m]istake is internal; it is a mental condition, conception, or conviction of the understanding, erroneous, but nonetheless a conviction, which influences the will and leads to some outward physical manifestation." Id. So stating, the Court concluded that the named defendant was entitled to rely upon the statutory defense in the case before it because notwithstanding a "recently executed border agreement which specifically defined the boundary between her property and that of the plaintiff, she really still believed in good faith" that the trees she cut were standing on her own property. Id.
From these authorities, this Court infers that the term "through mistake," as used in Section 52-109, means an honest conviction, entertained in good faith and not resulting from the plaintiff's own negligence, that she is the proper person to commence the lawsuit. Only if she bears the burden of proving that she acted upon such a conviction in commencing the lawsuit can the plaintiff's motion to substitute be granted. See Poly-PakCT Page 1364Corp. of America v. Barrett, supra, 1 Conn. App. at 101.
Finally, the defendants have suggested in their legal arguments that to qualify under the statute the plaintiff's mistake, even if honest and non-negligent, must be limited to a mistake about "the name" of the party plaintiff. The Court cannot agree with this suggestion for the following reasons. First, the statute is not limited by its terms to "clerical errors or mistakes." It is thus to be contrasted with narrower statutes which do contain such an express limitation, and thus have been construed not to apply to intentional errors or errors of substance. General Statutes § 12-60, for example, provides in relevant part as follows:
 Any clerical omission or mistake in the assessment of taxes may be corrected according to the fact by the assessors or board of assessment appeals, not later than three years following the tax due date relative to which such omission or mistake occurred. . . .
The adjective "clerical," as used in the statute, has been held to modify "mistake" as well as "omission." Bridgeport Brass Co.v. Drew, 102 Conn. 206, 210, 128 A. 413 (1925). So used, it has been held to distinguish "clerical errors," which are correctable under the statute, from "errors of substance, of judgment, or of law[,]" which are not. Reconstruction Finance Corporation v.Naugatuck, 136 Conn. 29, 32, 68 A.2d 161 (1949). The plain implication of this distinction is that the term "mistake," if unmodified by the adjective "clerical," includes "mistakes of substance, of judgment, and of law" in addition to clerical mistakes.
Second, modern cases discussing when the "wrong plaintiff" statute may properly be invoked have not limited the availability of the remedy of substitution to cases involving clerical errors in the naming or describing of plaintiffs. Instead, mistakes deemed correctable under the statute have obviously included errors as to who, among the successors to the original plaintiff's claim, actually had standing to assert the claim when the action was commenced. See, e.g., Wickes Mfg. Co. v. CurrierElectric Co., supra. No mere typo or misrendering of a corporate name, such an error is very clearly a mistake of substance. In sum, as the Appellate Court observed in Federal Deposit Ins.Corp, v. Retirement Management Group, Inc., supra,31 Conn. App. at 84, and Investors Mortgage Co. v. Rodia, supra,31 Conn. App. at 484, substitution may properly be ordered to "correct[ ] a CT Page 1365 mistake in ascertaining the real party in interest" (emphasis added) not just an error in the description, spelling or punctuation of a known party's name.
 Determination if the Plaintiff Commenced This Action "Through Mistake," Within the Meaning of Section 52-109
Mrs. DiLieto explained in her testimony on the motions to add or substitute that the reason she commenced this lawsuit in her own name, without informing or seeking permission from the bankruptcy trustee, was that since July 9, 1996 or shortly thereafter, when she and her husband received formal notification that their scheduled debts had been discharged, she honestly and reasonably believed that her bankruptcy was over. The Court believes this explanation and finds it reasonable for the following reasons.
Mrs. DiLieto testified without contradiction that she and her husband first considered filing for bankruptcy in the winter of 1995-96, when their financial situation was becoming desperate. Mr. DiLieto was out of work on disability due to a work-related injury suffered in an elevator accident. Mrs. DiLieto was back to work for the City of New Haven, but struggling with pain in her genital area that had not gone away, as the defendants had predicted, following her May 1995 surgery.
The DiLietos discussed their bankruptcy with Attorney Richard Belford, a New Haven attorney who had previously represented them. Attorney Belford was a logical person for the DiLietos to consult about bankruptcy, because he was a member of the panel of Chapter 7 trustees who had been authorized by the United States Trustee, a division of the United States Department of Justice, to be appointed as Chapter 7 trustees in Chapter 7 Bankruptcy cases filed in the United States Bankruptcy Court for the District of Connecticut.
The DiLietos' joint petition for relief under Chapter 7 of the Federal Bankruptcy Code was filed, in the United States Bankruptcy Court for the District of Connecticut on March 20, 1996. Attached to the petition, and made part of it, were several lengthy schedules which Attorney Belford prepared for the DiLietos' signatures based on information they gave to him in their initial meetings with him. Before the DiLietos signed the petition, Attorney Belford reviewed the schedules with them line by line. After they signed the petition, he signed it as well, CT Page 1366 thereby confirming that its contents were true and accurate based on what he had been told. Mr. DiLieto, who had most of the pre-filing conversations with Attorney Belford, was listed as the "debtor" on the petition, and Mrs. DiLieto was listed as his "spouse." Very clearly, however, each was a principal debtor on their joint petition.
One of the schedules attached to the petition, entitled "Schedule B — Personal Property," listed a category of property labeled "[o]ther contingent and unliquidated claims of every nature, including tax refunds, counter claims of the debtor, and the rights to setoff claims." Under the Federal Bankruptcy Code, that term includes not only claims that have already been filed before courts or other competent tribunals, but other rights of action which, though they accrued to the debtor before he filed for bankruptcy, have not yet resulted in formal legal action.
By that definition, the claims presented in this lawsuit, all of which accrued to Mrs. DiLieto in May of 1995, were "contingent [or] unliquidated claims," which should have been so listed and reported in her bankruptcy schedules on March 20, 1996. However, no such claim was listed in the bankruptcy schedules, either as a contingent claim or otherwise. Instead, the category in question listed only three claims that one of the petitioners had already filed: first, Mr. DiLieto's Workers Compensation claim arising from his elevator accident; second, Mr. DiLieto's personal injury claim against three alleged third-party tortfeasors in connection with the elevator accident; and third, Mrs. DiLieto's loss of consortium claim arising from her husband's accident. The schedule contains no statutory definition of the term "contingent claim," and does not otherwise give notice to or require acknowledgment by the petitioners that they had any obligation to report the later discovery of any such claim. Though Attorney Belford avers that he reviewed the DiLietos' schedules with them before they signed and filed their petition, he does not state what, if anything, he told them about what was reportable as a "contingent claim."
In May of 1996, after the appointment of Attorney Michael Daly as trustee for the DiLietos' bankruptcy estate, he met with the DiLietos and Attorney Belford at the formal meeting of creditors, which Mrs. DiLieto referred to as a "closing". At that meeting, Mr. and Mrs. DiLieto reviewed their petition and schedules with Attorney Daly under oath, swearing to the correctness and completeness of their contents. However, as no transcript or CT Page 1367 minutes of this meeting were submitted to this Court, it is impossible to determine how the questioning of the debtors was conducted. There is therefore no evidence before this Court that Attorney Daly did anything more than ask if the DiLietos had anything to add to or change in their filed schedules. More to the point, there is no evidence that he ever defined for them the term "contingent claim," much less that he so defined it to include as-yet-unfiled claims or "possible claims" whose existence was unknown or legal validity had not yet been established.
After the meeting of creditors, the DiLietos heard nothing further from the bankruptcy trustee or Attorney Belford until they received the latter's July 9, 1996 letter informing them that their scheduled debts had been discharged. Attached to the letter was a formal notice of discharge from the United States Bankruptcy Clerk, which provided as follows:
 IN RE: Robert T. DiLieto Case Number 96-30842-asd Michelle DiLieto Debtor(s)
* * *
DISCHARGE OF DEBTOR
 It appearing that a petition commencing a case under title 11, United States Code, was filed by or against the person named above on 3/20/96, and that an order for relief was entered under chapter 7 and that no complaint objecting to the discharge of the debtor was filed within the time fixed by the court [or that a complaint objecting to discharge of the debtor was filed and, after due notice and hearing, was not sustained]:
IT IS ORDERED THAT:
 1. The above-named debtor is released from all dischargeable debts.
 2. Any judgment heretofore or hereafter obtained in any court other than this court is null and void as a determination of the personal liability of the debtor with respect to any of the following:
(a) debts dischargeable under 11 U.S.C. § 523; CT Page 1368
 (b) unless heretofore or hereafter determined by order of this court to be nondischargeable, debts alleged to be excepted from discharge under clauses (2), (4), (6), and (15) of 11 U.S.C. § 523(a);
(c) debts determined by this court to be discharged.
 3. All creditors whose debts are discharged by this order and all creditors whose judgments are declared null and void by paragraph 2 above are enjoined from instituting or continuing any action or employing any process or engaging in any act to collect such debts as personal liabilities of the above-named debtor.
Dated 7/9/96
BY THE COURT
 Bernardine A. Gordon United States Bankruptcy Clerk
Attorney Belford's letter with attached Discharge of Debtor was the last communication the DiLietos received from the United States Bankruptcy Court before this lawsuit was commenced in early February of 1997.
Upon receiving the letter and Discharge of Debtor, which Mr. DiLieto opened and read to his wife, the DiLietos believed that their bankruptcy was over. They had filed for bankruptcy to obtain a discharge of their scheduled debts, and by this letter they received formal notification that those debts had been discharged. In their minds, as in the mind of the average layman with no legal training or personal experience, direct or vicarious, with bankruptcy matters, their bankruptcy was over.
Against that background, there being no evidence on this record that the DiLietos were over advised to the contrary, they honestly and reasonably believed that they had no further reason to contact the bankruptcy trustee for any purpose. Surely they knew of no reason to obtain his permission to commence this lawsuit.
It is true, of course, that Mrs. DiLieto had been exploring the possibility of filing a malpractice action against one or more of CT Page 1369 the instant defendants since late 1995, when she first contacted Attorney Regina DeLuca, a local malpractice specialist with training as a nurse, to investigate the viability of such a claim. Attorney DeLuca accepted the engagement to conduct such an investigation by entering into a written contract with Mrs. DiLieto. Though the contract was never produced for the Court's inspection, it plainly did not commit Attorney DeLuca to filing a lawsuit for Mrs. DiLieto before she completed her investigation. Under our law, Attorney DeLuca was first required to determine, based on reasonable inquiry, if there was a good-faith basis for believing in the existence of grounds to support such a lawsuit. General Statutes § 52-190a.[8]
Attorney DeLuca took several steps in conducting her investigation. First, she encouraged Mrs. DiLieto to obtain all of her medical records from her treating physician, Dr. Stewart Casper, who performed the hysterectomy upon her, and from Yale-New Haven Hospital. Second, she encouraged Mrs. DiLieto to obtain her pathology slides from Yale so that they could be examined by medical experts to determine if the defendants were negligent in concluding that she had cancer before she was advised to undergo surgery. Third, she referred Mrs. DiLieto to an expert neurologist to determine if her post-surgery pain was attributable to the surgery.
Though certain of the experts disagreed with the defendants that the slides were consistent with a cancer diagnosis, and the neurologist who examined her found that she had suffered nerve damage as a result of the lymph node dissection, Attorney DeLuca's investigation was still ongoing when, on March 20, 1996, the DiLietos signed and filed their bankruptcy petition. At that time, as Mrs. DiLieto put it when she was examined by defense counsel at the hearing on these motions, she "did not have a lawyer." More significantly, as would be confirmed for her over the next three months, she did not have a lawyer who could properly file a malpractice action in the manner required by law, that is: supported by a certificate attesting to the lawyer's good-faith belief that grounds existed for such an action based on the conduct of a reasonable inquiry as to the existence of such grounds. General Statutes § 52-190a. In short, Mrs. DiLieto did not have a lawyer because the lawyer she consulted did not yet have sufficient grounds, based on reasonable inquiry, for a good-faith belief that there had been negligence in her care and treatment in May of 1995. CT Page 1370
In fact, two months after she and her husband filed for bankruptcy, Mrs. DiLieto received a two-page letter from Attorney DeLuca, advising her that she would no longer continue with her investigation of Mrs. DiLieto's proposed claim against these defendants. The reason given for Attorney DeLuca's termination of her investigation was directly tied to the results of her scientific investigation. On that score, she flatly stated: "This decision is based on my investigation of the case, including consultation with several experts and a review of the relevant literature."
Upon receiving this letter, Mrs. DiLieto knew for certain that, at least in the eyes of Attorney DeLuca., she had no viable medical malpractice claim notwithstanding the reports of three pathologists that they disagreed with the defendants' findings and the report from the consulting neurologist that she had suffered nerve damage during her surgery. Such a state of affairs, though troubling to Mrs. DiLieto, is surely not uncommon. That is why juries are always instructed, typically at defense request, that doctors are not insurers, who must compensate injured patients for every bad result, but medical professionals who must make informed judgments and render medical care and treatment in accordance with the prevailing standard of care in their respective specialties. Doctors' mistakes are not actionable as malpractice unless they constitute deviations from the standard of care. Plainly, the experts consulted by Attorney DeLuca were unwilling to state that any mistake made by those who treated Mrs. DiLieto fell outside the standard of care.
Disagreeing with Attorney DeLuca, but unable to act on her own unconfirmed suspicions, Mrs. DiLieto promptly brought her fully indexed records and expert reports to a New York lawyer of her acquaintance, Attorney Sybil Shainwald. Attorney Shainwald, in turn, sent the plaintiff's complete file to another malpractice specialist, Attorney Michael Koskoff of Bridgeport. To Mrs. DeLuca's consternation, Attorney Koskoff and his law firm flatly rejected the case by a letter from Attorney Joel Lichtenstein to Attorney Shainwald dated June 24, 1996. In that letter, which was the last word Mrs. DiLieto would hear from any lawyer about the viability of her proposed malpractice action before learning that her debts had been discharged, Attorney Lichtenstein wrote as follows:
 Re: Michelle DiLieto CT Page 1371
Dear Ms. Shainwald:
 Thank you for your referral of the above captioned individual to my partner, Michael Koskoff. He has asked me to review the materials and to advise you whether or not this is a matter that we would be interested in pursuing.
 In addition to several members of the medical malpractice team reviewing the information you and Ms. DiLieto sent along, the information was reviewed by one of my expert consultants specializing in the field of pathology. It is our opinion that the most unfortunate events that have occurred did not result from a deviation in the accepted standard of care. As such, this is a matter in which we would not wish to get involved.
* * *
From these words, which were shared with her by Attorney Shainwald, Mrs. DiLieto learned not only that Attorney Koskoff and his law firm would not take her case, but that they had affirmatively concluded that it had no legal merit despite her doctors' erroneous diagnosis of cancer. What happened to her was "unfortunate," as Attorney Lichtenstein described it, but she had no legal recourse to deal with it.
In the months that followed her receipt of the Discharge of Debtor, Mrs. DiLieto contacted her current counsel, Attorneys Rodney Margol and Garrett Moore, who retraced the steps of Attorneys DeLuca and Koskoff but came to a different conclusion as to the legal viability of her claims. On the strength of their investigation and resulting conclusion, they filed this lawsuit in February 1997 accompanied by the mandatory certificate of good-faith belief that grounds existed for the plaintiff's claims.
When Attorneys Moore and Margol commenced this action they were not aware of the plaintiff's bankruptcy. Mrs. DiLieto claims, and the Court finds, that she did not tell them about it until several months after suit was filed because she believed it was over, she felt it had nothing to do with her malpractice claim, and she was embarrassed to talk about it. Lacking any notice that there would ever be a need to return to bankruptcy court to disclose such an action or the claims made in it, this course was entirely logical for Mrs. DiLieto to take. It does not indicate any desire on her part to conceal the action or claims from the CT Page 1372 bankruptcy trustee.
The defendants have attempted to demonstrate that at the moment this action was commenced, Mrs. DiLieto was or should have been aware that she had no right to do so in her own name. For the reasons that follow, this Court disagrees.
First, the defendants argue that Mrs. DiLieto's filing of this action without notifying or seeking permission from the bankruptcy trustee is part of a continuing course of conduct dating back to her original bankruptcy filing in March of 1996. Having failed to reveal her right of action at that time by not listing these claims as contingent claims, she allegedly demonstrated an intent to conceal them in the future if and when such claims were ever filed. Such a course, moreover, is claimed to have been part of an overall effort by Mrs. DiLieto and her husband to understate their assets, including Mrs. DiLieto's work status, pension rights, cameras, jewelry, and tickets for a cruise.
As for the hiding of her right of action, the Court has already rejected that claim for two reasons. First, there is no testimony on this record tending to establish that Mrs. DiLieto ever knew or was told, orally or in writing, that an as-yet-unfiled claim that accrued prior to the bankruptcy should be reported on the bankruptcy schedule as a contingent claim. Attorney Belford did not aver that he did so in his sworn affidavit, and nothing presented to this Court shows that the bankruptcy trustee did so either at the meeting of creditors in May 1996 or at any other time. None of the plaintiff's or her husband's listed "contingent claims" was such an as-yet-unfiled claim, and nothing on the schedule gave her notice that such a claim should be listed if it existed.
Even, moreover, if it can somehow be inferred that Mrs. DiLieto — a non-lawyer with no bankruptcy experience — knew or learned the true definition of "contingent claim," it is evident from the foregoing description of her dealings with Attorney DeLuca that as of March 1996, she had no basis for believing that she had a valid right of action with respect to her 1995 treatment and surgery. Attorney DeLuca's charge was to determine, based on reasonable inquiry, whether or not Mrs. DiLieto had a viable malpractice claim against anyone. Until that investigation was completed, she would not and could not bring the claim to court, and Mrs. DiLieto knew it. CT Page 1373
After the petition was filed, moreover, and before the discharge of her scheduled debts, Mrs. DiLieto received nothing but clear confirmation that she still had no claim. The rejection letters from Attorneys DeLuca and Lichtenstein, both based on full knowledge of all relevant facts by then accumulated, sent a clear message that, whatever her suspicions, they were unfounded in fact and in law. A reasonable person in Mrs. DiLieto's situation would not then have thought that she had a valid right of action against anyone stemming from her surgery in 1995.
In light of the foregoing observations, the Court has no further need to consider the defendants' claim that she engaged in a pattern of understating or misreporting her assets, of which the failure to list this right of action was allegedly a part. Still, it must note that those claims of understatement or misrepresentation of assets are largely unfounded, and thus do not establish a pattern of deception as the defendants have argued.
It is true, as the defendants claim, that at one point in her bankruptcy schedule it is indicated that the plaintiff was on leave from work. On that same page, however, her then current income was accurately reported, as was projected total family income, including her income in the total. Plainly, the mistaken reference to being on leave had no effect on the proper reporting of the plaintiff's earnings or assets.
As for the plaintiff's supposed failure to mention her interest in a pension, she testified credibly, and without contradiction, she had no such rights in 1996.
As for the plaintiff's supposed failure to mention hobby equipment, including cameras, in her bankruptcy schedules, the plaintiff correctly noted that the schedules have a separate listing for computer and ideographic equipment, which is filled out. There is also a listing for household goods, which is completed. Thus, the evidence on misleading with respect to cameras or video cassette recorders is at best equivocal, notwithstanding Attorney Belford's statement, in his sworn affidavit, that he would have listed the cameras in question had he known of their existence.
There is, to be sure, an evident misstatement in the petitioner's bankruptcy schedule concerning her jewelry. Though CT Page 1374 she admittedly owned an engagement ring, a wedding ring, gold earrings, certain watches and some costume jewelry in 1995, none of it is listed in the category labeled "jewelry" on the schedules. The plaintiff's only explanation for this omission is that her attorney saw her engagement ring but didn't correct the schedule or point out to her that it should be corrected. This explanation is unconvincing. Ultimately, however, it is of no moment on the issue here presented. It does not establish a pattern of deception by Mrs. DiLieto and, of course, it has nothing to do with her failure to list the contingent claims at issue in this case.
Finally, the defendants have suggested that Mrs. DiLieto and her husband took a cruise at the end of March 1996, and therefore that they failed to report either the ownership of pre-purchased cruise tickets or the cash with which to buy them after March 20, 1996. In support of this allegation, they rely on copies of the plaintiff's time cards for 1996 and 1997, which allegedly show that the only time she was out of work for five straight days in that time period was in the last week of March 1996. It is certainly possible that the DiLietos took a cruise in the time frame suggested, and if so, it raises troubling questions about their candor towards the Bankruptcy Court and their creditors. On the record, however, the evidence is at best equivocal on the subject, for even if the DiLietos did take a cruise sometime in 1996 or 1997, Mrs. DiLieto's time card shows two periods, not one, when she was out of work for at least five days. The first, as the defendants have argued, is in late March of 1996. The second is over Labor Day weekend of that same year. The Court is unwilling to speculate as to which of these periods was that in which a cruise was taken, and thus is also unwilling to draw the damning inference here contended for.
The defendants also insist that Mrs. DiLieto knew or should have known that her bankruptcy was ongoing after July of 1996 despite her receipt of the Discharge of Debtor notice. There is nothing, however, in either the Discharge of Debtor or the accompanying letter from Attorney Belford to so suggest, and nothing in any of the papers she had previously signed to advise her that the bankruptcy would still be open in the post-discharge period. Even Attorney Belford, in his sworn affidavit, makes no statement that he so informed Mrs. DiLieto or her husband at any time. In sum, Mrs. DiLieto's reaction to the letter was entirely understandable. In her mind, the matter was closed once her debts were discharged. CT Page 1375
In opposition to the foregoing conclusion, the defendants have pointed to two other matters they claim to evidence an awareness by Mrs. DiLieto that her bankruptcy was still open following her discharge. The first is a May 1996 letter from the bankruptcy trustee to the DiLietos' lawyer in their lawsuit concerning Mr. DiLieto's work-related injury, Attorney John Grillo of New Haven. This letter, it is claimed, apprised Mrs. DiLieto that the bankruptcy trustee had a controlling interest in the lawsuit, and thus that they could not settle the case without his knowledge and approval.
The letter in question surely says that the DiLietos' lawsuit could not be settled without the trustee's approval. The letter fails to say, however, that the need for such approval would still exist once the scheduled debts were discharged. Hence, far from informing the DiLietos that nothing would change in the event of discharge, it could be read to suggest that the trustee would control the claim only so long as the bankruptcy was open.
Even, however, if the DiLietos somehow became aware that their bankruptcy was still open with respect to their previously filed claims against the parties allegedly responsible for Mr. DiLieto's workplace injury, such notice was hardly sufficient to establish that the proceeding remained open for other purposes — particularly for a claim whose viability had no support from any expert or lawyer until the discharge of debts became final. It was therefore not deceptive of Mrs. DiLieto not to mention her previous bankruptcy to Attorneys Moore and Margol until long after they filed this lawsuit on her behalf.
The final basis upon which the defendants claim knowledge on the part of Mrs. DiLieto that her bankruptcy case was still open in the post-discharge period is evidence that towards the end of 1995, she communicated with Attorney Belford concerning the retrieval of certain property from the family home, which by then was in foreclosure. The short answer to this suggestion is provided by the defendants' own evidence, which shows that before the communications in question took place, the trustee had abandoned any claim to the DiLietos' house. Therefore, any contacts between the DiLietos and Attorney Belford in the wake of the abandonment did not concern the bankruptcy at all.
 Conclusion
CT Page 1376
In conclusion, Mrs. DiLieto's claim that she had no knowledge of the inappropriateness of naming herself as plaintiff when she commenced the instant lawsuit is well founded. She was led to take that action by an honest mistake — made in good faith and without negligence on her part — that her bankruptcy was over when her scheduled debts were discharged. Accordingly, the Court hereby ORDERS that her motion and that of the bankruptcy trustee to substitute the trustee as party plaintiff are GRANTED, and the defendants' motions to dismiss for lack of subject-matter jurisdiction are DENIED.
MICHAEL R. SHELDON, J.