[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] Memorandum of Decision
I. Statement of the Case
This case is an administrative appeal from a decision of the defendant Department of Public Utility Control (DPUC), in DPUC Docket No. 99-09-12RE01, Application of the Connecticut Light and Power Company andthe United Illuminating Company for Approval of Their Millstone NuclearGeneration Assets Divestiture Plans-Sale of Millstone Station to DominionResources, Inc. (DPUC January 24, 2001 Decision). The other defendants are the Connecticut Light and Power Company (CLP), the United Illuminating Company (UI), Dominion Resources, Inc. (DRI or "Dominion"), Dominion Nuclear Connecticut, Inc. (DNC), and J.P. Morgan Securities, Inc. The plaintiff appealing this decision is the Connecticut Coalition Against Millstone (CCAM). The CCAM describes itself as "an organization of statewide groups and individuals devoted to safe and sustainable energy." (Complaint, ¶ 1). In connection with this appeal, the CCAM has moved for a stay, pursuant to General Statutes § 4-183 (f), of the pending sale of the Millstone facility approved by the DPUC.
II. Procedural History
On January 24, 2001, the DPUC approved the application of the Connecticut Light and Power Company and the United Illuminating Company for approval of their Millstone Nuclear Generation Assets divestiture plans, specifically, the sale of Millstone Station to Dominion Resources, Inc. (DPUC January 24, 2001 Decision). Effectively, this decision approved the sale of Millstone Units 1, 2, and 3 for the purchase price of approximately $1.298 billion to Dominion Nuclear Connecticut, Inc., an indirect subsidiary of Dominion Resources, Inc. (DPUC January 24, 2001 Decision.) The sale was authorized "pursuant to the Divestiture Plan as approved by the [DPUC] in the Decision dated April 19, 2000. . . ." (DPUC January 24, 2001 Decision, p. 2). The divestiture plan was submitted pursuant to General Statutes § 16-244g (c)(1).[1] The closing on the properties is scheduled for April 1, 2001.
The CCAM, an intervenor at the administrative level, has commenced this administrative appeal through its February 20, 2001 complaint, in which it has asserted numerous issues of administrative error.[2] These include, among others, that the purchaser, DNC, "has no assets and has never owned nor operated a commercial nuclear power facility, nor is it presently licensed to operate a nuclear power facility"; (Complaint, CT Page 4174 ¶ 14); that, in contravention of General Statutes § 16-244g (b) (2),[3] "DRI does not meet all applicable qualifications established by federal law and regulations;" that "DNC does not meet all applicable qualifications established by federal law and regulation;" that "[t]he sale was not conducted in accordance with the divestiture plan as approved by DPUC;" that "[n]either DRI nor DNC established that it would preserve labor agreements in effect at the time of the sale;" and that "[t]he sale will not result in a net benefit to ratepayers." (Complaint, ¶ 43(1)(a-e).) The CCAM further alleges that it is "aggrieved by the DPUC's decision"; (Complaint, ¶ 41); and that "CCAM and its members possess specific personal and legal rights and interests in the subject matter of the proceedings and their specific personal and legal interests have been specially and injuriously affected by the decision which is the subject of this appeal." (Complaint, ¶ 42 (1-4).)
On March 1, 2001, the CCAM filed a motion for stay pursuant to General Statutes § 4-183 (f), with an accompanying memorandum of law, seeking an order imposing a stay of the January 24, 2001 final decision of the DPUC "to preserve the status quo pending an adjudication of this appeal." (Motion for Stay.) All of the defendants filed objections to the motion for stay, with accompanying memoranda of law and voluminous attached documents.
The court promptly scheduled a hearing on the motion for stay, which was held on March 12, 2001. At the day-long hearing, all parties appeared through counsel and presented comprehensive argument to the court. In addition, the CCAM was permitted to present the testimony of six witnesses. The court also received into evidence a number of exhibits and substantial portions of the administrative record, which the offering parties determined to be pertinent to the pending motion.[4] Following the hearing, the parties were permitted to file additional briefs relevant to this motion. As a result of a March 15, 2001 motion by the CCAM, the parties were permitted to file a third "memorandum of law relevant to all issues presently before the court." The parties were also permitted to "attach and make reference in the [memoranda] to any relevant portions of the Administrative record not previously submitted to the court." (March 15, 2001 Court Order.)
III. Discussion
A. Applicable Standard for Motion to Stay Agency Decisions
General Statues § 4-183 (f) provides, in pertinent part, "[t]he filing of an appeal shall not, of itself, stay enforcement of an agency decision. An application for a stay may be made . . . to the court. . . . A stay, if granted, shall be on appropriate terms." Id. "We have CT Page 4175 previously analogized the process of granting or denying a stay under § 4-183 pending the outcome of the administrative appeal to the process of granting or denying a temporary injunction to preserve the status quo pending the full hearing on the merits of a case." WaterburyTeachers Assn. v. Freedom of Information Commission, 230 Conn. 441, 451,645 A.2d 978 (1994). "A party seeking injunctive relief has the burden of alleging and proving irreparable harm and lack of an adequate remedy at law." Scinto v. Sosin, 51 Conn. App. 222, 245, 721 A.2d 552 (1998), cert. denied, 247 Conn. 963, 724 A.2d 1125 (1999).
The Connecticut Supreme Court, in Griffin Hospital v. Commission onHospitals Health Care, 196 Conn. 451, 493 A.2d 229 (1985), appeal dismissed, 479 U.S. 1023, 107 S.Ct. 781, 93 L.Ed.2d 819 (1986), set forth the criteria for deciding whether to grant a motion for an administrative stay. The Griffin court approved a "`balancing of the equities' test. . . . Among the `equities' to be placed on the scales . . . are the general equitable considerations which are involved in the issuance of a temporary injunction to preserve the status quo pendente lite. These include the concerns specified in the federal standard. . . ." Id., 460. "The federal standard focuses upon: (1) the likelihood that the appellant will prevail; (2) the irreparability of the injury to be suffered from immediate implementation of the agency order; (3) the effect of a stay upon other parties to the proceeding; and (4) the public interest involved." Id., 456.
B. Application of Legal Standard to Plaintiff's Motion
The defendants have taken the position that the CCAM has failed to satisfy any of the delineated factors of the Griffin test. Further, they have asserted that the plaintiff lacks subject matter jurisdiction over the appeal because it is not legally aggrieved, and, therefore, has no standing to bring this appeal. The defendants have also raised a claim of federal preemption concerning the state's nuclear safety regulatory authority.
At the March 12, 2001 hearing, the attorneys presented extensive arguments to the court concerning the issues of aggrievement and standing, as well as on the merits of the motion for stay. The CCAM called six witnesses in its efforts to demonstrate aggrievement and to prove the necessity of a stay. In its March 13, 2001 posthearing brief, the CCAM addressed the defendants' challenge to the subject matter jurisdiction of the court, stating, in part, that "[a]t [the] hearing on March 12, 2001, the defendants had the opportunity to prove that CCAM lacks [standing] to appeal, but it failed to do so, " and, further, that the "CCAM's witnesses included four members who all reside within the five-mile emergency evacuation zone of Millstone" which allowed them to CT Page 4176 "enjoy a special legal status which is not shared by the vast majority of the population of the State of Connecticut." (CCAM's March 13, 2001 Posthearing Brief, p. 7). Thereafter, the parties were given a third opportunity to address standing, and all other relevant issues, pursuant to the court's March 15, 2001 order.
"[A] claim that this court lacks subject matter jurisdiction [may be raised] at any time." (Brackets in original; internal quotation marks omitted.) Dowling v. Slotnik, 244 Conn. 781, 787, 712 A.2d 396 (1998). "[O]nce the question of lack of jurisdiction of a court is raised, [it] must be disposed of no matter in what form it is presented . . . and the court must fully resolve it before proceeding further with the case." (Brackets in original; internal quotation marks omitted.) Figueroa v. C S Ball Bearing, 237 Conn. 1, 4, 675 A.2d 845 (1996). "Aggrievement is a question of fact for the trial court and the plaintiff has the burden of proving that fact." Water Pollution Control Authority v. Keeney,234 Conn. 488, 493, 662 A.2d 124 (1995).
"Pleading and proof of aggrievement are prerequisites to a trial court's jurisdiction over the subject matter of an administrative appeal." (Internal quotation marks omitted.) United Cable TelevisionServices Corp. v. Dept. of Public Utility Control, 235 Conn. 334, 342,663 A.2d 1011 (1995). "It is . . . fundamental that, in order to have standing to bring an administrative appeal, a person must be aggrieved." Id. "An appeal from an administrative decision of the [DPUC] is governed by [General Statutes] § 16-35[5] and the Uniform Administrative Procedure Act; General Statutes §§ 4-166 through 4-189." Id., 341. "Mere status . . . as a party or a participant in a hearing before an administrative agency does not in and of itself constitute aggrievement for the purposes of appellate review." (Internal quotation marks omitted.) New England Rehabilitation Hospital of Hartford, Inc. v. CHHC,226 Conn. 105, 132, 627 A.2d 1257 (1993).
In the present case, the issue of aggrievement was raised by the parties during the March 12, 2001 hearing on the motion for stay, and the court allowed additional briefing on issues relevant to the motion, including the issue of aggrievement. If this court ultimately determines that the CCAM lacks aggrievement, it is required to deny the motion for stay because lack of aggrievement would be relevant to the issue of the likelihood that the CCAM would prevail on the merits.
A court may address aggrievement as a threshold issue in the context of a motion to stay. In Park City Hospital v. Commission on Hospitals Health Care, 210 Conn. 697, 556 A.2d 602 (1989), the issue was whether the trial court was in error in dismissing, suo motu, the "plaintiff's appeal for lack of aggrievement as incident to the plaintiff's application CT Page 4177 for a stay of execution." Id., 700. Our Supreme Court held that, "although a threshold determination of aggrievement was not necessary in order to take up the application for a stay of execution, the trial court was well within its authority to do so, inasmuch as such a determination impacted upon the court's ultimate jurisdiction to hear the appeal." Id., 703.
Accordingly, under the authority of Park City Hospital v. Commission onHospitals Health Care, supra, this court will address the CCAM's aggrievement because it impacts this court's ultimate jurisdiction to hear the CCAM's appeal.
C. Aggrievement
The CCAM alleges that it "is an organization of statewide groups and individuals devoted to safe and sustainable energy." (Complaint, ¶ 1.) It alleges that it is aggrieved by the DPUC's decision to approve the sale of Millstone because "CCAM and its members possess specific personal and legal rights and interests in the subject matter of the proceedings and their specific personal and legal interests have been specially and injuriously affected by the decision which is the subject of this appeal. . . ." (Complaint, ¶ 42.) Specifically, it claims that its "membership includes families with children who own property and reside within the five-mile emergency evacuation zone of Millstone and who, by virtue of their propinquity to Millstone, are at great risk of harm to their health and safety from unsafe operations of Millstone including unsafe operations resulting from business decisions dictated by the economic considerations at issue in these proceedings." (Complaint, ¶ 42(1).) It further alleges that its membership "includes organizations whose memberships include families with children who reside near Millstone, and are thereby at risk of harm to their health and safety from unsafe operations of Millstone. . . ." (Complaint, ¶ 42 (2).) The CCAM also alleges that its headquarters are located ten miles downwind of Millstone and within the ten-mile evacuation zone. (Complaint, ¶ 42(3).) It further claims that "[t]he decision which is the subject of this appeal permits the ownership and operation of Millstone . . . by a limited liability company without assets and without adequate capitalization," and the subject decision thereby "promotes reckless cost-cutting and job insecurity; jeopardizes a safety conscious work environment; illegally defers clean-up of the radiologically and chemically contaminated site for decades; fails to require adequate financing for decommissioning of the site; fails to require adequate financing to protect the public and its workforce during routine operations and from accidents; and directly endangers the public health and safety, most particularly those members of the public closest to Millstone, including CCAM and its membership." (Complaint, ¶ 42(4).) CT Page 4178
When evaluating the standing of an association, a court applies "the federal test for representational standing that was articulated in Huntv. Washington State Apple Advertising Commission, 432 U.S. 333, 343,97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). We have adopted that test as a matter of Connecticut law." Connecticut Associated Builders Contractors v.Hartford, 251 Conn. 169, 185, 740 A.2d 813 (1999). "Under that test, [a]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." (Brackets in original; internal quotation marks omitted.) Id.
The individual members of the CCAM would otherwise have standing to sue in their own right if they demonstrated first "a specific personal and legal interest in the subject matter of the decision, as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second . . . [they] must successfully establish that this specific personal and legal interest has been specially and injuriously affected by the decision." Med-Trans of Conn., Inc. v. Dept.of Public Health Addiction Services, 242 Conn. 152, 158, 699 A.2d 142
(1997).
The final DPUC decision appealed from involves the approval of the sale of the Millstone facility. To the extent that the allegations contained in paragraphs 42(1), 42(2) and 42(3) claim aggrievement from risks to health and safety from the unsafe operation of Millstone, the court finds that these claims do not relate to the sale of the facility, but to theoperation of the facility. The allegations contained in paragraph 42 (4), concerning the approval of the sale, and the alleged consequences to the CCAM, its members, and to members of the public, do involve aspects of the proposed sale. The court finds, however, that none of the above mentioned claims afford standing to the CCAM.
A general interest in health and safety is insufficient to comply with the first prong of aggrievement. In Nizzardo v. State TrafficCommission, 55 Conn. App. 679, 739 A.2d 744 (1999), cert granted,252 Conn. 943, 747 A.2d 520 (2000), the Appellate Court affirmed the trial court's dismissal of a plaintiff's appeal from a decision of the state traffic commission. The commission had granted a traffic certificate to a developer in connection with a proposed shopping center. The plaintiff owned property in the vicinity of the proposed development. The trial court had observed that the plaintiff "offered no evidence that his safety, as a member of the public, would in any way be at risk by the operation of the proposed development, and his testimony CT Page 4179 simply revealed speculative fears that there would be adverse impacts upon his economic interest with respect to his various real estate holdings." (Internal quotation marks omitted.) Id., 687. The trial court had cited to Southington v. State Traffic Commission, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 362840 (January 14, 1991, Mulcahy, J.) (3 Conn.L.Rptr. 610), for the proposition that "all community members particularly those living, or occupying land, in the immediate vicinity of the particular state highway, are interested in the public safety of that highway system; however, that general interest alone is not the specific, personal and legal interest necessary for aggrievement, permitting an appeal from a determination regarding public safety rendered by the [commission]." (Brackets in original; emphasis added; internal quotation marks omitted.) Id. The Appellate Court expressly agreed with this proposition and concluded that the trial court had properly found that the "plaintiff failed to demonstrate the necessary specific, personal and legal interest in the commission's decision. . . ." Id., 687-88.
In the present case, the CCAM similarly fails to demonstrate a specific, personal and legal interest in the DPUC's decision. Rather, it merely claims a general interest in health and safety that implicates a broad-based, public concern.
At the March 12, 2001 hearing conducted by this court, the CCAM called six witnesses to testify. The witnesses either lived within a five-mile radius of Millstone, were members of the CCAM, or had been, or were at the time of the hearing, employed at the plant.
Geralyn Winslow, a CCAM member residing in Waterford within two miles of Millstone, expressed concern regarding alleged chemical dumping on a ballfield, and the discharge of cooling waters into Long Island Sound. Further, she claimed to know three children who had contracted leukemia when units 2 and 3 of Millstone were restarted. She testified that she was a member of the Millstone One Decommissioning Committee, which she claimed is a part of the Nuclear Energy Advisory Council. Another witness, Billie Staub, a CCAM member living two miles from the plant, also claimed to know individuals who had contracted cancer, including a former plant employee. She testified that Northeast Utilities had been fined $5 million for the illegal dumping of hydrozine, but had no information as to whether Millstone continues to illegally dump this substance. She also claimed that Millstone should not be sold until two lost spent fuel rods, missing since 1980, were located. Although she had no specific knowledge concerning any illegal dumping, she expressed concern about the ballfield and the town landfill. She also expressed worry with respect to the high costs of decommissioning, and Dominion's ability to safely carry this out, but she admitted that she had no CT Page 4180 knowledge of Dominion's safety or financial history. Another CCAM member, Joseph Besade, who lives 1.75 miles from the plant, testified that his daughter was injured in an oil spill, but was not clear as to how this related to the Millstone case.
Clarence O. Reynolds, a CCAM member residing 1.25 miles from Millstone, was a former plant employee who claimed he was discharged after he raised certain safety issues. He also voiced concern regarding future illegal discharges and future cost-cutting measures that would affect his family adversely. Reynolds indicated that at least one Dominion-owned plant had been placed on a NRC watch list in 1989. Upon cross-examination, however, he acknowledged that the plants subsequently received high ratings for safety.
The final two witnesses, James F. Hodgdon, Jr. and David M. Collins, expressed generalized employment-related concerns. Hodgdon testified that he was employed by Burns Security, which is contracted by Millstone to provide security. He voiced concern regarding the effect of the sale on union membership. Collins claimed there was an unresolved issue with respect to the effect of the sale on employee pension equity. Collins further emphasized that he was neither a member of the CCAM, nor did he support its views.
Aggrievement "is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected." (Internal quotation marks omitted.) LightRigging Co. v. Department of Public Utility Control, 219 Conn. 168, 173592 A.2d 386 (1991). "[T]here is a difference, [however], between a `possibility' and rank speculation." Hendel's Investors Co. v. ZoningBoard of Appeals, Superior Court, judicial district of New London at New London, Docket No. 543418 (March 24, 1999, Parker, J.), aff'd62 Conn. App. 263, 274, ___ A.2d ___ (2001). Further, "[a]llegations and proof of mere generalizations and fears are not enough to establish aggrievement." (Internal quotation marks omitted.) Water PollutionControl Authority v. Keeney, supra, 234 Conn. 496. "To satisfy the aggrievement requirement . . . [CCAM] must allege a legally protected interest that is concrete and actual, not merely one that is hypothetical." New England Rehabilitation Hospital of Hartford, Inc. v.CHHC, supra, 226 Conn. 127.[6]
The subject matter of the DPUC's final decision was the approval of thesale of Millstone. The witnesses voiced concerns with regard to future violations, employment-related matters, and Dominion's financial viability, and, although such claims may relate to the sale of Millstone, the court finds that such claims do not establish aggrievement as they fail to rise to the level of a "possibility." Rather, these CT Page 4181 claims constitute generalizations, fears and speculation. With respect to the testimony concerning incidents of cancer, the court is not persuaded that such testimony relates to the sale of Millstone. In any event, neither Winslow nor Staub were competent to testify on matters regarding claimed incidents of cancer within their respective towns in connection with the Millstone plant, and this has not otherwise been proven to the court. Accordingly, the court finds that the CCAM fails satisfy the first prong of aggrievement.
The court further finds that the CCAM fails to satisfy the second prong of aggrievement. "The second prong of the aggrievement test requires the plaintiff to demonstrate that its asserted interest has been specially and injuriously affected in a way that is cognizable by law." (Internal quotation marks omitted.) Med-Trans of Conn., Inc. v. Dept. of PublicHealth Addiction Services, supra, 242 Conn. 159. When considering whether the CCAM's interest has been injuriously affected by the DPUC's decision, the court looks at whether the injury the CCAM complains of, that is, its aggrievement, or the adverse effect upon the organization, "falls within the zone of interests sought to be protected by the statutory provision whose violation forms the legal basis" of the CCAM's complaint. (Internal quotation marks omitted.) Id.
The DPUC concluded that the sale complied with all of the applicable requirements of General Statutes § 16-244g, it was consistent with General Statutes § 16-43, and that Dominion's proposed decommissioning financing plan met all applicable requirements of General Statutes § 16-19m through 16-19q. (DPUC January 24, 2001 Decision, p. 22.)
General Statutes § 16-244g applies to the divestiture of nuclear electric generation facilities and the approval of such sale by the DPUC. This legislation provides "for the restructuring of Connecticut's electric utilities and the opening of [the] Connecticut economy to competition and customer choice in the sale and provision of electric generation services. . . ." 41 H.R. Proc. Pt 4, 1998 Sess., p. 1076, remarks of Representative Mary Eberle, Chair of the Energy and Technology Committee. This legislation was designed to "benefit all electric rate payers in this state through lower rates, more diversity of supply, cleaner air and enhanced economic development. It will free rate payers from the burden of antiquated technology and allow our economy to take advantage of developments and innovations in the marketplace. It will place the risk of investment in generating facilities squarely where it belongs, on the shoulders of shareholders, not our rate payers. It will improve the reliability of our electric supply by making more sources of generation available to us." 41 H.R. Proc. Pt 4, 1998 Sess., p. 1077, remarks of Representative Mary Eberle. The court finds, therefore, that CT Page 4182 this legislation was designed to serve an economic purpose: to foster competition and to reduce the financial burden on the state's ratepayers.[7]
Similarly, General Statutes § 16-43, the statute governing the merger or sale of public service companies, is expressly concerned with the economics and financial aspects of merging, buying or selling such companies. In addition, General Statutes §§ 16-19m through 16-19q
governs the decommissioning of nuclear power generating facilities, focusing, in particular, on decommissioning financing plans and, decommissioning costs.
The CCAM does not allege an adverse impact on any economic or financial interests, and the court finds that the CCAM has failed to allege an injury that falls within the zone of interests protected by the above-mentioned statutes.
IV Conclusion
The record clearly demonstrates that all parties were given notice that the issue of the court's subject matter jurisdiction was being challenged. The parties were given a full opportunity to address this jurisdictional issue.[8] For the reasons discussed above the court hereby dismisses the CCAM's appeal on the basis that it has not sufficiently pleaded or proven aggrievement.[9]
BY THE COURT
Peter Emmett Wiese, Judge